G. Frank Dougherty, Respondent, *v.* The Equitable Life Assurance Society of the United States, Appellant. (Actions Nos. 3, 10, 12, 13, 24, 25, 27, 37 and 47.)

Same, Appellant and Respondent, *v.* Same, Respondent and Appellant. (Actions Nos. 4 and 28.)

Lewis A. Pinkussohn, Respondent, *v.* Same, Appellant. (Actions Nos. 23, 29, 49, 54, 60, 69, 72, 74 and 100.)

Same, Appellant and Respondent, *v.* Same, Respondent and Appellant. (Action No. 112.)

Lewin Blechmann, Respondent, *v.* Same, Appellant.

Louis E. Ramm, Respondent, *v.* Same, Appellant.

Corinne M. Rodkinson, as Executrix of Norbert M. Rodkinson, Deceased, Respondent, *v.* Same, Appellant.

Friedrich W. Suessman, Respondent, *v.* Same, Appellant.

Noussin A. Vitkoup, Respondent, *v.* Same, Appellant.

(Argued November 22, 1934; decided December 31, 1934.)

74

*Walter H. Pollak, G. Frank Dougherty, Murray I. Gurfein, Thomas I. Emerson, George J. Hadjinoff* and *Ruth R. Kessler* for plaintiffs, appellants and respondents. After performance in Russia became impossible the alternative performance promised in New York was the only practicable performance. In such a situation the place of performance test requires the application of the New York law. The agreement for the application of " existing laws " of the Russian Empire became inapplicable when those laws were overthrown. Such an agreement is in any event irrelevant where defendant repudiates and there is no issue of performance. The situs of the obligations has been in New York since the closing of the Russian-branch. (*Savage* v. *O' Neil*, 44 N. Y. 298; *Monroe* v. *Douglass*, 5 N. Y. 447; *Petrogradsky Bank* v. *National City Bank*, 253 N. Y. 23; *Vladikavkazsky Ry. Co.* v. *New York Trust Co.*, 263 N. Y. 369; *Sliosberg* v. *New York Life Ins. Co.*, 244 N. Y. 482; *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347; *Sokoloff* v. *National City Bank*, 239 N. Y. 158; *Rex* v. *Lovitt*, [1912] A. C. 212; *Union Nat. Bank* v. *Chapman*, 169 N. Y. 538; *Richard* v. *American Union Bank*, 241 N. Y. 163; *Severnoe Securities Corp.* v. *London & Lancashire Ins. Co.*, 255 N. Y. 120; *Hutchison* v. *Ross*, 262 N. Y. 381; *Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204.) The recognition of Soviet Russia cannot give effect here to Soviet decrees of confiscation and cancellation. Our public policy forbids. (*Vladikavkazsky Ry. Co.* v. *New York Trust Co.*, 263 N. Y. 369; *Salimoff & Co.* v. *Standard Oil Co.*, 262 N. Y.

220 ; *Frenkel & Co.* v. *L' Urbaine Ins. Co.*, 251 N. Y. 243; *Second Russian Ins. Co.* v. *Miller*, 297 Fed. Rep. 404; 268 U. S. 552; *James & Co.* v. *Rossia Ins. Co.*, 247 N. Y. 262; *Petrogradsky M. K. Bank* v. *National City Bank*, 253 N. Y. 23; *Matter of People [First Russian Ins. Co.]*, 255 N. Y. 428; *James & Co.* v. *Second Russian Ins. Co.*, 239 N. Y. 248; *Sliosberg* v. *New York Life Ins. Co.*, 244 N. Y. 482; *Sedgwick, Collins & Co.* v. *Rossia Ins. Co.*, [1926] 1 K. B. 1.)   The Soviet decree for the monopolization of insurance and the liquidation of insurance companies and the decree canceling contracts of insurance are impotent in the New York courts to release a corporation of New York from obligations to whose exact fulfillment that corporation had pledged all its assets.   The decrees are purely confiscatory and could have no extraterritorial effect even if so intended by the Soviet. (*Baglin* v. *Cusinier*, 221 U. S. 580; *Lecouturier* v. *Rey*, [1910] A. C. 262; *Joint Stock Co.* v. *National City Bank*, 240 N. Y. 368; *James & Co.* v. *Second Russian Ins. Co.*, 239 N. Y. 248; *First Russian Ins. Co.* v. *London & Lancashire Ins. Co.*, [1928] 1 Ch. 922; *Matter of People [Russian Reinsurance Co.]*, 255 N. Y. 415; *Matter of People [Second Russian Ins. Co.]*, 244 N. Y. 606; *Fischer* v. *Hope Mut. Life Ins. Co.*, 69 N. Y. 161; *People* v. *Empire Mut. Life Ins. Co.*, 92 N. Y. 105.)   At the time the restitution claims arose the ruble had been restored to par.   The courts below gave effect to the restoration of the currency.   The principle that obligations are to be paid in the currency existing at the time of their accrual compels this result.   (*Matter of People [First Russian Ins. Co.]*, 255 N. Y. 428; *Deutsche Bank* v. *Humphrey*, 272 U. S. 517; *Legal Tender Cases*, 12 Wall. 457; *Matter of James*, 248 N. Y. 1; *Richard* v. *American Union Bank*, 253 N. Y. 166; *Parker* v. *Hoppe*, 257 N. Y. 333; 258 N. Y. 365; *Hoppe* v. *Russo-Asiatic Bank*, 235 N. Y. 37; *Matter of Lendle*, 250 N. Y. 502; *Buerger* v. *New York Life Ins. Co.*, 43 Times L. R. 601.)

*John W. Davis, William C. Cannon* and *David E. Hudson* for defendant, respondent and appellant. The contracts in suit are Russian contracts. The questions of whether, and to what extent the defendant is liable, if at all, are to be determined by the law of Russia. (*Perry v. Equitable Life Assur. Society*, 45 Times L. R. 468; *Burns v. Burns*, 190 N. Y. 211; *Fidelity & Casualty Co. v. Walton*, 24 Okla. 671; *Badger v. American Popular Life Ins. Co.*, 103 Mass. 244; *McCully v. Phœnix Mut. Life Ins. Co.*, 18 W. Va. 782; *Equitable Life Assur. Society v. Clements*, 140 U. S. 226; *Pool v. New England Mut. Life Ins. Co.*, 123 App. Div. 885; *Northwestern Mut. Life Ins. Co. v. McCue*, 223 U. S. 234; *Equitable Life Assur. Society v. McRee*, 75 Fla. 257; *Metropolitan Life Ins. Co. v. Bradley*, 98 Tex. 230; *Union National Bank v. Chapman*, 169 N. Y. 538; *Graham v. First Nat. Bank*, 84 N. Y. 393; *Bowen v. Newell*, 13 N. Y. 290; *Richard v. American Union Bank*, 241 N. Y. 163; *Stumpf v. Hallahan*, 101 App. Div. 383; 185 N. Y. 550; *Buerger v. New York Life Ins. Co.*, 43 Times L. R. 601; *Heine v. New York Life Ins. Co.*, 45 Fed. Rep. [2d] 426; 50 Fed. Rep. [2d] 382.) The effect of the recognition of the Soviet government is to make the Soviet law and decrees applicable herein. (*Salimoff & Co. v. Standard Oil Co.*, 262 N. Y. 220; *Ricaud v. American Metal Co.*, 246 U. S. 304; *Oetjen v. Central Leather Co.*, 246 U. S. 297; *Underhill v. Hernandez*, 168 U. S. 250; *Terrazas v. Holmes*, 227 S. W. Rep. 206; *Molina v. Commission Reguladora*, 104 Atl. Rep. 450; *Luther v. Sagor*, [1921] 3 K. B. 532; *United States v. Schooner Peggy*, 1 Cranch, 103; *People ex rel. Clark v. Gilchrist*, 243 N. Y. 173; *McMaster v. Gould*, 240 N. Y. 379; *Robinson v. Robins Dock & Repair Co.*, 238 N. Y. 271.) Plaintiffs have no cause of action. The Soviet decrees relating to life insurance contracts of defendant discharged the defendant from all liability with respect to its Russian policies. (*Perry v. Equitable Life Assur. Society*, 45 Times L. R. 468; *Matter of People v. Second*

*Russian Ins. Co.*, 243 N. Y. 524; 244 N. Y. 606; *Matter of People* v. *Russian Reinsurance Co.*, 255 N. Y. 415.) Plaintiffs are not entitled to recover the same amount of Soviet currency as the amount of Imperial currency expressed in the contract, ruble for ruble. The obligations expressed in Imperial currency must be measured in the Soviet currency at the ratio of equivalence prescribed by Soviet law. (*Parker* v. *Hoppe*, 257 N. Y. 333; *Deutsche Bank* v. *Humphrey*, 272 U. S. 517; *Anderson* v. *Equitable Life Assur. Society*, 42 Times L. R. 302; *Salimoff & Co.* v. *Standard Oil Co.*, 262 N. Y. 220; *Tillman* v. *Russo-Asiatic Bank*, 51 Fed. Rep. [2d] 1023; *Klochkov* v. *Petrogradski Bank*, 268 N. Y. Supp. 433.)

*Joseph M. Proskauer, Philip A. Carroll, J. Alvin Van Bergh* and *Frank A. F. Severance* for National City Bank of New York, *amicus curiæ*.

CRANE, J. On November 16, 1933, the United States extended formal recognition to the Soviet Republic. The first question which arises in this case is as to the effect this recognition gives to the laws of the Soviet Republic passed in 1918 and 1919; the second question relates to the valuation of the ruble after 1924, to be paid under contracts made prior to 1918.

The Equitable Life Assurance Society of the United States had a concession or was licensed to do business in Russia under laws of the Imperial government. In 1890 the Russian government enacted the laws of August 10, 1890, known as the policy rules (Pravila), stating the regulations which were to govern the conduct of the Equitable's business in Russia. These were inserted in each policy issued by the defendant and became a part of each insurance contract. The defendant was obliged to keep on deposit with the government or the State bank sufficient assets to more than meet the liabilities incurred by the policies issued. The defendant at all times not

only kept the required cash deposit, but also bonds, more than equal to the reserve premiums upon all policies issued in Russia.

Paragraph 1, clause 7, of the policy rules provides "that all disputes which may arise in connection with the assurance operations carried on by the Society in Russia shall be settled according to Russian laws and in Russian courts of justice." This was plaintiffs' Special Exhibit A, an interpretation of the original. The defendant's interpretation, defendant's General Exhibit 14, reads: "That the litigation of claims which might arise with the Society in connection with the business pertaining to its operations in Russia be pursued on the strength of our existing laws and in Russian court institutions." These varying interpretations mean the same thing, as the referee who decided this case said: "All disputes which may arise in connection with the insurance operations * * * shall be settled according to the Russian laws and in Russian courts of justice." Another provision, made part of the contract of insurance, was that this right to do business in Russia might at any time be canceled, in the discretion of the government, without explanation. If permission be withdrawn and the defendant expelled from Russia the society "must immediately liquidate its business in Russia and settle its accounts with the assured in the manner that shall be indicated to it by the Russian government."

All the policies upon which these twenty-six test actions have been brought were made in Russia by Russian citizens, to be performed there, and the obligation of the contract depended not only upon its specific terms but also upon the Russian law. The referee said: "The result of these various provisions is that these policies were made in Russia and were to be performed there. All payments to the defendant were to be made in Russian currency. What the insured or his beneficiary was to

receive was the sum promised in Russian rubles. Primarily they were to be paid from funds accumulated in St. Petersburg for that purpose. Only if such funds proved insufficient or if for some reason payment could not or was not there made might recourse be had to the general assets of the Society, by which the Russian obligations of the defendant were guaranteed."

This last statement of the referee had reference to another provision of the rules or Pravila made part of the contract of insurance. It reads, "That the exact fulfillment of the obligations entered into by the Society regarding the Russian assured shall be guaranteed, besides its sums and security found in Russia, by all the property belonging to the Society."

Let us pause here to consider this paragraph. It is the obligation of the society in Russia which is guaranteed. When the obligation has once been established the society pledges its funds to meet the obligation. Its funds or property may be anywhere. The obligation, however, only arises under Russian law. Until the Russian law, not New York law, determines that there be an obligation, the Equitable is not liable. By the undisputed terms of the insurance policy these obligations, or any disputes about them, are to be determined by the Russian law; the guaranty of all the property of the Equitable only applies to an obligation which is or becomes such under that law. The plaintiffs have read these contracts as if the defendant had said, " If for any reason we cannot carry on this insurance business in Russia we will take over the policies and carry them on from New York. If the Russian law will not give you relief we will guarantee you a continuance of the policy and of our obligations under it in spite of Russian law; no matter how the government of Russia by its legitimate laws may affect the insurance contract or policies, we will carry out the obligation as though it were an obligation to be performed

according to New York law." There is no such contract. Russians in Russia made a contract as to which " all disputes  *  *  *  shall be settled according to the Russian laws." If the Imperial government had continued, had not been destroyed by revolution, there can be no doubt that the decrees of such government affecting these insurance policies or requiring the Equitable to liquidate in the manner indicated by the government would have been within the very terms of these policies of insurance. The question here presented is whether a different result follows when the Imperial government has been succeeded by a republic.

The specific finding of the referee is, " The application for the policy herein was made in Russia. The policy herein was issued under, and subject to the law of 1871, Concession and Policy Rules." These rules, so far as material, are given above. The referee also found as a fact that not only was the contract of insurance made in Russia, but all premiums were to be paid in rubles in Russia at the St. Petersburg office of the defendant. The contract provided: " The policy shall take effect when (after the actual payment of the first premium) it has been countersigned by the General Manager for Russia."

The law of the place of performance generally governs the contract and its discharge. (American Law Institute, Restatement of the Law of Conflict of Laws, § 385; *Zimmermann* v. *Sutherland*, 274 U. S. 253; 2 Wharton on Conflict of Laws [3d ed. 1905], § 467-b; 1 Joyce on the Law of Insurance [2d ed. 1917], § 225.) But we are not left to the general rule, whether it be the place of performance or some other place, because the parties have stipulated that the Russian law shall govern. The policy rules further provided that, if the assured failed to pay a premium on due date or within two months thereafter, the policy would lapse and become null and void and the insurance would terminate unless the

defendant permitted the policy to be reinstated after the performance by the insured of certain conditions precedent, except that an assured, who had paid not less than three full annual premiums, was entitled to the surrender value of the policy, if applied for within one year after date of lapse, or to a paid-up policy for a reduced amount, if applied for within six months after date of lapse. All these applications were to be made to the defendant's general manager for Russia. While it is true that the referee made a finding that these contracts were to be primarily performed in Russia, we understand this to mean that the defendant may pay its assured wherever the assured might be found. But this does not mean that its obligations are to be determined by the law of the country where the insured may be able to obtain jurisdiction over the defendant. Wherever sued that obligation is to be determined by Russian law, for such is the contract, and no court of this State has power to make a new contract for the parties. Not the Russian law, but the contract made between the assured and the Equitable in Russia, is the basis for all these actions, and into that contract we must read that all disputes regarding the obligations of the contract are to be determined by the Russian law. The law of the situs of tangible property may or may not determine the right to its possession and ownership. The right to a sum of money due upon contract is to be determined by the terms of that contract the world over. "The obligation is not enlarged by the fact that the creditor happens to be able to catch his debtor here." (*Deutsche Bank* v. *Humphrey*, 272 U. S. 517, 519.)

Certain events have become history: The great war began in August of 1914; by March of 1917 the Imperial government of Russia was overthrown, followed by the Kerensky government, which was recognized by us; in turn the Soviet government became the ruling power in Russia on November 7, 1917, and has been the govern-

ment of that country, recognized at different dates by the various powers in Europe, and on November 16, 1933, recognized by the United States. (American Journal of International Law, vol. 28, pp. 90 and 96.)

Being a *de facto* government in Russia and, as to that country, *de jure* also, it passed an act or decree on December 1, 1918, declaring all kinds of insurance a State monopoly. This is known and characterized as the Monopolization Decree. All private insurance companies were to be subject to liquidation and became State property. This to some extent came within the terms of the rules and regulations of the Pravila, as contained in the contract of insurance. The termination of the right to do business in Russia always hung over the head of every policyholder as well as the defendant. Liquidation could be required under the Imperial government, which must be carried out according to its terms and conditions. Such was the contract. By the decree of November 18, 1919, life insurance in its then forms was abolished and all contracts annulled and canceled.

The referee made these findings, which state the situation exactly:

" The Soviet government is an organization with a written constitution, performing the functions of a government through executive, legislative and judicial branches thereof.

" The Soviet government has since November, 1917, existed in Russia, clothed with power to enforce its authority within its own territory, obeyed by the people over whom it rules, capable of performing the duties and fulfilling the obligations of an independent power, and able to enforce its claims by military force.

" On or about December 1, 1918, the Soviet government enacted and promulgated a decree declaring that the business of insurance within Russia should thereafter be an exclusive monopoly of the State, and that every private insurance company then doing an insurance

business in Russia, which included the defendant, should be subject to a complete liquidation. In said decree it was further provided that the conduct of the insurance business thus assumed and taken over by the Soviet government was to be entrusted to a government committee consisting of representatives of named departments of the Soviet government.

" Under Russian law, the Soviet government by its decrees and action pursuant thereto assumed all obligations of the defendant arising under its Russian policies of insurance, including the policy in suit.

" On or about November 18, 1919, the Soviet government enacted and promulgated a decree in which it was provided that life insurance in all its forms was cancelled, and that all contracts entered into with insurance companies and savings banks for the sake of life insurance, including the policy in suit, were cancelled and annulled.

" It was also provided in the decree of November 18, 1919, that a system of social protection should be established under the People's Commissariat of Labor and Social Insurance of said government."

In Russia, where all these insured were, with one or two exceptions, these decrees were laws to be obeyed. They were the laws of their government. As to them the Soviet Republic was no body of bandits, confiscating property, but an existing government, carrying out new theories of insurance. If the Russian people, under their Soviet form of government, determined to abolish all private insurance for their citizens and establish a system of social protection by the State, that was their affair, not ours, and however objectionable we may consider the monopolization of all business, including insurance and banking, and the conduct of it thereafter by the government, we at least must admit that other peoples can try the experiment if they desire.

The question now for us to determine is, what effect these laws and decrees of an established government,

binding upon the citizens of Russia in Russia, have upon this defendant's contracts, made in Russia with Russian citizens, to be determined and interpreted and given effect, if any, according to Russian law. Of course we start with the premise that the United States has now recognized the Soviet Republic, and that the government of Russia is in all respects to be treated as any other power in Europe. At the time the referee heard and decided this case the Soviet Republic had not been recognized by the United States. His conclusions of law and findings of fact were governed by our decisions existing at that time. We, however, must now give full force and effect to the action of our government. (*Ricaud* v. *American Metal Co.*, 246 U. S. 304; *Luther* v. *Sagor & Co.*, [1921] 3 K. B. 532.)

Let us reflect upon what would be the rulings of our courts were this same situation to arise in any other European country, where no open and violent revolution had taken place. Suppose one of the recognized nations of Europe should suddenly determine to nationalize its insurance companies, take the assets, cancel the policies, relieve the companies and the assured from all obligations and establish a system of State insurance for all its citizens. Such action, I take it, would be binding upon our insurance companies doing business there as to policies there issued to citizens of that country, to be enforced according to the law of the land. (*Russian Volunteer Fleet* v. *United States*, 282 U. S. 481, 492; *Wulfsohn* v. *Russian Republic*, 234 N. Y. 372, 375; *In re Russian Bank for Foreign Trade*, [1933] Ch. 745, 766.) Could the people of that nation come to this country, maintain actions on the policies, and recover upon the plea that the laws of their nation were not binding upon them and could not affect their contracts? Soviet Russia, as to all the insurance policies here in question, stands in the same position as if the government of Russia had never been interrupted by revolution; its

decrees have the same force and effect as if they had been issued by the Imperial government. It is difficult at times to turn the mind from actual facts to legal concepts, and *vice versa*. Here we must join the two. This is the result of recognition under the law of nations. Of course we refer to redress in courts of law and not action by diplomacy or through the State Department, with which we have nothing to do.

The doctrine is simple and has been stated as follows: " When a government," said the United States Supreme Court (*Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302, 303), " which originates in revolution or revolt is recognized by the political department of our government as the *de jure* government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence. * * * Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." (See, also, *Ricaud* v. *American Metal Co.*, 246 U. S. 304, which said that this rule applied even to property of an American citizen not residing in a foreign country.) To the same effect, *Underhill* v. *Hernandez* (168 U. S. 250).

We have recently applied this law in *Salimoff & Co.* v. *Standard Oil Co.* (262 N. Y. 220). To the same effect is *Luther* v. *Sagor & Co.* ([1921] 3 K. B., Court of Appeal, p. 532), wherein it was said: " The government of this country having * * * recognized the Soviet government as the government really in possession of the powers of sovereignty in Russia, the acts of that government must be treated by the courts of this country

with all the respect due to the acts of a duly recognized foreign sovereign state [p. 543]. * * * It must be quite immaterial for present purposes that the same views are not entertained by the government of this country, are repudiated by the vast majority of its citizens, and are not recognized by our laws " [p. 546].

A case exactly in point is *Perry* v. *Equitable Life Assur. Society* (decided in the King's Bench Division in April, 1929, and reported in the Times Law Reports, vol. 45, p. 468). (See, also, *Lazard Bros. & Co.* v. *Midland Bank, Ltd.*, [1933] App. Cas. 289; *In re Russian Bank for Foreign Trade*, [1933] Ch. 745, 766, 767; *White, Child & Beney, Ltd.*, v. *Eagle, Star & British Dominions Ins. Co.*, 127 Law Times Rep. [N. S.] 571. See " Recognition Cases " by Prof. Dickinson in American Journal of International Law [1931], vol. 25, p. 214.)

The plaintiffs have relied upon *Buerger* v. *New York Life Assur. Co.* (43 Times Law Rep. 601, decided May 23, 1927, by the Court of Appeal), which held that these Russian decrees did not invalidate insurance policies taken out with foreign insurance companies. The two judges concurring in this decision emphatically placed their ruling upon the fact that the evidence for the plaintiffs was uncontradicted, while Lord Justice SCRUTTON wrote a well-reasoned dissent. This case was not followed by Mr. Justice BRANSON in the *Perry Case* (*supra*), although he referred to it. He said: " The Court of Appeal by a majority reversed his [Mr. Justice GREER] decision on this point, holding that the learned judge was not entitled to disregard the uncontradicted evidence of the only expert on Russian law who had been called before him " [p. 470].

The opinion of the People's Commissariat of Justice, interpreting the existing laws on the request of the Central and Local Authorities to the effect that the decrees of November 18, 1919, had no application to contracts of life assurance, made by Russian subjects

with companies having assets in the United States, means, as we understand it, that the Soviets were legislating for Russians in Russia as to matters over which they had jurisdiction. Naturally their acts could not affect contracts made in New York nor contracts to be performed here according to New York law. The decrees speak for themselves and were in evidence before the referee. They canceled all insurance policies made in Russia, to be paid there; insurance in Russia was dead; these policies could not be enforced there, for such was the law. All questions or disputes about the policies were to be settled by Russian law. The referee felt that he should exercise his own judgment in construing the decrees of 1918 and 1919, the Monopolization Decree and the Cancellation Decrees, and in this he acted according to authority. In *Petrogradsky M. K. Bank* v. *National City Bank* (253 N. Y. 23, 34) we said: " True, of course, it is that there is no judicial notice of the law of foreign lands. This does not mean, however, that the mere opinion of a witness will control the judgment of a judge except to the extent that it is a reasonable inference from statute or from precedent or from the implications of a legal concept, such as contract or testament or juristic personality." (See, also, Civ. Pr. Act, § 391.) Judge ANDREWS, the referee, said: " Whatever witnesses called as experts may say, I must interpret the result of these decrees."

It might be noted in passing that Lord Justice BANKES, who wrote the prevailing opinion in *Buerger* v. *New York Life Ins. Co. (supra)*, later in *White, Child & Beney, Ltd.*, v. *Eagle, Star & British Dominions Ins. Co.* (127 Law Times Rep. [N. S.] 571), reviews *Luther* v. *Sagor & Co. (supra)* and finds it still the law.

The plaintiffs seek to make a distinction between the seizure of tangible property (*Salimoff* and *Sagor* cases) and the disposition and canceling of rights to intangible property. We can see no distinction in this instance. The right to collect money by a Russian citizen on a

contract to be interpreted according to Russian law is no different in this respect than the right to tangible property in Russia or the possession thereof. Both rights are dependent upon the law of Russia. Referring to unclaimed deposits due by a California bank, the United States Supreme Court, in *Security Sav. Bank* v. *California* (263 U. S. 282, p. 285), said: "Thus the deposits are clearly intangible property within the State. Over this intangible property the State has the same dominion that it has over tangible property."

The plaintiffs, respondents, have referred to certain of our cases as indicating that the recognition of the Soviet Republic by this country gives no validity to previous decrees. All of these, with one exception, had to do with contracts made out of Russia, most of them with contracts made in New York, to be governed by New York law. The language of any opinion must be confined to the facts before the court. No opinion is an authority beyond the point actually decided, and no judge can write freely if every sentence is to be taken as a rule of law separate from its association. Thus, in *Frenkel & Co.* v. *L' Urbaine Fire Ins. Co.* (251 N. Y. 243), it was held that the law of France confiscating the property of Germans could not affect a contract held by our citizens to be performed here. *James & Co.* v. *Second Russian Ins. Co.* (239 N. Y. 248) also related to a contract made out of Russia; and as to the effect of the trade agreement made between Great Britain and Russia we since have had the *Lazard Case* (*supra*).

*Sokoloff* v. *National City Bank* (239 N. Y. 158) related to a deposit made in the National City Bank in the city of New York, governed solely by New York law. *Vladikavkazsky Ry. Co.* v. *New York Trust Co.* (263 N. Y. 369) applied peculiarly to a New York contract, a deposit in a New York bank, which the depositor sought to get back. The bank sought to set up title in the third party.

Much reliance is placed upon *Sliosberg* v. *New York Life Ins. Co.* (244 N. Y. 482). This case declared section 169-a of the Civil Practice Act unconstitutional as depriving parties entitled to sue here on certain insurance policies of a remedy for an indefinite period of time. This is all the case did decide. All other points discussed were merely incidental. To the suggestion that the Constitution did not apply to foreign contracts, Judge KELLOGG took the point of view that the policy in suit was a New York contract. That this was unnecessary, see *Cook* v. *Moffat* (46 U. S. 295); *Western Nat. Bank* v. *Reckless* (96 Fed. Rep. 70, particularly pp. 77 and 78); *Lamb* v. *Powder River Live Stock Co.* (132 Fed. Rep. 434, 439).

Section 169-a applied to contracts made by citizens in New York as well as to those made by Russians in Russia.

An action to enforce a contract of insurance, even if made in Russia, could be maintained in the New York courts. The Russian law, however, might be applicable to its enforcement. Judge KELLOGG recognized this, for he says: " The policy sued upon was issued in Russia; it was made subject to Russian laws;" and he concluded with this marked reservation and explanation: " We do not mean to say that this defendant has presently no defense to this action. That question is not now involved. For, the defendant is not now urging that the Soviet decrees canceling all Russian insurance policies are binding upon this plaintiff, a Russian citizen resident in Russia when the decrees were passed. On the contrary, it is urging that the stay law will result in supplying a defense *not now* possessed " (pp. 492, 498).

As the question decided in this *Sliosberg* case related solely to the constitutionality of section 169-a of the Civil Practice Act, and came up on a motion for a stay, the points now up for review were not so thoroughly discussed or presented as they have been in these cases,

after extended evidence taken before a referee. Under these circumstances we do not feel justified in taking the *Sliosberg* case as the final word upon these Russian policies.

Recognition does not compel our courts to give effect to foreign laws if they are contrary to our public policy. Some writers have suggested that non-recognition was an insufficient reason for the refusal of our courts to enforce the laws of another country; rather, it should have been that those laws were contrary to our public policy. ("The Unrecognized Government in American Courts," by Professor Borchard, 26 American Journal of International Law, [1932] 261, 268; "Judicial Aspects of Foreign Relations," [1933] Louis L. Jaffe; "Comparative and International Aspects of American Gold Clause Abrogation," by Arthur Nussbaum, vol. XLIV, Yale Law Journal, p. 53 [November, 1934].)

However, it cannot be against the public policy of this State to hold nationals to the contracts which they have made in their own country to be performed there according to the laws of that country. When they have specifically stipulated that the laws of their native land shall govern their acts we give effect to those laws after recognition by this country the same as we would give effect to the laws of any nation which had not developed out of revolution.

Our conclusion, therefore, is that, since recognition, the Soviet decrees became the laws of Russia, governing the policies here in question, and that obligations thereunder were at an end.

Assuming, however, that these contracts of insurance were not terminated by these Soviet decrees, and that the plaintiffs may recover the premiums paid prior to 1918, upon the theory of repudiation by the company in 1920, we also find that the plaintiffs cannot maintain this action, for the reason that the rubles in which payment is to be made are valueless. The courts below

have treated these insurance policies, issued in Russia prior to 1918, as continuing contracts, at least for the paid-up amount to which a holder might be entitled after three years' premiums had been paid. As the company wrote off from its books its assets and liabilities in Russia in 1920, the referee considered this a repudiation of these contracts entitling the plaintiffs to rescind at any time within six years after they learned of the fact. The Appellate Division has held that in the cases where the policies became due upon proof of death or survivorship the assured could sue for the amount any time they desired to do so; that there was no limitation upon the time within which they might present this proof. Nineteen of these cases are based on rescission, in which the plaintiffs desire to get back the money paid in premiums. The actions were commenced between 1925 and 1930, and the courts below have allowed the valuation of the ruble as of the time when the actions were commenced. The chervonetz currency of 1924 has been taken as the standard of exchange. This we consider error.

We again turn to the findings of the referee as a correct statement of the currency situation in Russia between 1918 and 1925. All life assurance operations were to be effected in "Russian credit value," which the referee found to mean "legal tender paper currency Russian rubles, and not gold or silver."

"In 1889, when the defendant began to operate in Russia the only legal tender paper currency in circulation in Russia were State Credit Notes."

"By decree of July 24, 1914, the exchange of State Credit Notes for gold coins was suspended.

"In 1917, the Provisional Government of Russia issued State Credit Notes in denominations of 1,000 and 250 rubles, which became known as 'Duma' rubles."

In 1917 came the "Kerensky" ruble, which circulated equally as legal tender with the old Imperial rubles, or State Credit Notes, and the "Duma" rubles. In 1917

when the Soviet government came into power it continued all these legal tender issues.

Then follow the referee's findings, which state the facts as succinctly as possible:

" By decree of May 15, 1919, the Soviet government authorized an unlimited issue by the People's Bank of Credit Notes of 1918 pattern and decreed that all other legal tender currency then in circulation which included the old State Credit Note, should continue to circulate equally and should be accepted by all institutions and persons on a par with Credit Notes of the newly created Soviet pattern.

" By decrees of the Soviet government dated June 28, 1922, and September 8, 1922, the issuance of all pre-1922 currencies was discontinued as of July 1, 1922; until October 1, 1922, they were exchangeable into 1922-pattern rubles at the rate of 10,000 old rubles equal to 1 ruble of the 1922-pattern.

" By decree of October 24, 1922, the Soviet government issued the 1923-pattern; and it was provided that 1 ruble of the 1923-pattern should be equal to 100 rubles of the 1922-pattern (or 1,000,000 rubles of State Credit Notes of the pre-1922 patterns).

" The Romanoff (Imperial) Duma and Kerensky rubles remained full legal tender in Russia under the Soviet government until October 1, 1922.

" By decree of August 22, 1923, the Soviet government ordered that the 1922-pattern rubles should cease to be legal tender as of October 1, 1923, and that they should be exchangeable into rubles of the 1923-pattern at the rate of 100 rubles of the 1922-pattern equal to 1 ruble of the 1923-pattern.

" By decree of the Soviet government dated February 5, 1924, there was established a new Soviet pattern called ' Treasury Notes in Rubles in Gold,' " known as the " State Treasury Notes of 1924."

" By decree of the Soviet government dated March 7, 1924, money tokens of 1923-pattern were withdrawn

from circulation by way of redemption into the new State Treasury Notes of 1924, at the rate of 50,000 rubles of the 1923-pattern equal to 1 ruble State Treasury Note of 1924.

" By the decree of November 3, 1921, and by a decree of April 6, 1922, it was expressly provided that all contracts and obligations stipulated or established in legal tender currency rubles of pre-1922 patterns could be discharged by payment of one ruble in the new currency rubles of the 1922 pattern for each 10,000 rubles of the obligation.

" By decrees of June 28, 1922, and September 8, 1922, all currency rubles of the pre-1922 patterns, namely State Credit Notes, Douma Notes, and Kerenski, as well as all the Soviet patterns were withdrawn from circulation by way of their redemption in currency rubles of the new 1922 pattern at the rate of 10,000 currency rubles of the pre-1922 patterns for one currency ruble of the 1922 pattern, and ceased to be legal tender on October 1, 1922.

" By a decree of February 14, 1924, it was provided that issuance of paper money of all the previous patterns was forthwith to be discontinued.

" By a decree of March 7, 1924, it was provided for the withdrawal from circulation of the currency rubles of 1923 pattern by way of their redemption into State Treasury Notes at the rate of one ' ruble in gold ' in State Treasury Notes for 50,000 rubles in currency rubles of the 1923 pattern, and the currency rubles of the 1923 pattern ceased to be legal tender on May 10, 1924.

" By the decree of February 5, 1924, it was expressly provided that all contracts and obligations stipulated or established in currency rubles of the then existing patterns could be discharged, at the time of their maturity, by payment of the new State Treasury Notes of 1924, expressed in ' rubles in gold,' and namely at the officially quoted rate of exchange of the ' gold ruble ' in terms of currency rubles of the 1923 pattern.

" By a decree of March 7, 1924, the rate of currency rubles of the 1923 pattern in terms of ' rubles in gold ' in State Treasury Notes of 1924 was definitely fixed at 50,000 currency rubles of 1923 pattern equal to one ' ruble in gold ' in State Treasury Notes of 1924.

" By virtue of the decrees of February 5, 1924 and March 7, 1924, all contracts and obligations expressed in currency rubles of 1923 pattern could be discharged, at the time of their maturity, by payment of the new State Treasury Notes of 1924 expressed in ' rubles in gold ' at the fixed rate of one ' ruble in gold ' in State Treasury Notes for 50,000 rubles of the obligation.

" By a decree of July 25, 1922, and by another decree of October 11, 1922, the new Soviet State Bank was authorized to issue bank notes expressed in ' chervontzi,' representing the gold contents of the former Imperial Russian 10-ruble coins.

" Under Soviet law contracts and obligations expressed in legal tender currency rubles of the pre-1922 pattern, or of the 1922 pattern, or of the 1923 pattern, were not deemed to be expressed in Chervonetz bank notes.

" Under Soviet law the ratio of legal equivalence between State Treasury Notes of 1924 and the currencies which were legal tender and in circulation in Russia prior to March 7, 1924, is as follows:

" One ruble in State Treasury Notes of 1924 or subsequent issues is legally equivalent to 50,000 rubles of the 1923 pattern.

" One ruble in State Treasury Notes of the 1924 or subsequent issues is legally equivalent to 5,000,000 rubles of the 1922 pattern.

" One ruble in State Treasury Notes of the 1924 or subsequent issues is legally equivalent to 50,000,000,000 of all the pre-1922 patterns.

" Under Soviet law, all obligations expressed in legal tender currency rubles of pre-1922 patterns, maturing between November 3, 1921 and October 1, 1923, could be

discharged at the time of their maturity in rubles of the 1922 pattern, at the rate of one currency ruble of 1922 pattern for each 10,000 rubles of the obligation or any part thereof.

" Under Soviet law, all obligations expressed in legal tender currency rubles of pre-1922 patterns, maturing between October 24, 1922 and May 10, 1924, could be discharged at the time of their maturity in rubles of the 1923 pattern at the rate of one currency ruble of the 1923 pattern for 1,000,000 rubles of the obligation or any part thereof."

The referee refused to find the following request: " Under Soviet law, all obligations expressed in legal tender currency rubles of pre-1922 patterns, maturing after March 7, 1924, could be discharged at the time of their maturity in State Treasury Notes, at the rate of one ' ruble ' in State Treasury Notes for 50 billion rubles of the obligation or any part thereof."

The refusal to find this request does not mean that there was no ratio established for paying pre-existing obligations in the new treasury notes of 1924. In fact the referee has failed to find that there is any Soviet law establishing that pre-existing obligations payable in State credit notes, such as the obligations of these insurance policies, were to be paid *ruble for ruble* in the 1924 gold treasury note. The plaintiffs' proposed general finding of fact LXVII that, since June, 1924, the Soviet State Bank has freely exchanged State *credit* notes and chervonetz bank notes one for the other, does not refer to pre-existing State credit notes, but to the 1924 issue of State *treasury* notes. (See plaintiffs' reference in their supplemental brief, p. 125, where the statement is made that there are State treasury notes and chervonetz notes which are exchangeable one for the other, referring to this finding of the referee.) (See " Judicial Aspects of Foreign Relations," by Louis L. Jaffe, p. 192.)

The referee also found " that chervonetz bank notes are legal tender in Russia for the payment of all private debts," but he fails to find at what ratio, if any, pre-existing obligations are payable in the chervonetz, or that they are payable " ruble for ruble." Since June 1, 1924, the only paper currency in circulation in Russia has been the State treasury notes and the chervonetz bank notes.

To summarize this currency situation according to these findings, we find that at the outbreak of the war in 1914, the Russian ruble was worth in exchange about fifty-one cents of our money. The circulating medium was paper notes, called " State Credit Notes." These were legal tender and, without doubt, as the referee found, were the money of the country at the time the policies were issued. After the war began the value of this money steadily declined. Some form of money there had to be to, carry on the ordinary transactions of life, and the money of Russia fluctuated in its purchasing or exchange value each year and according to events. To meet these changing values additional issues were created, more paper money was printed until, by 1922, it had become virtually worthless.

Events, not legislation, very largely control the inherent value of money. This process of decline was not peculiar to Russia. All countries suffered from it, by reason of the war and what happened thereafter. Germany with its mark, France with its franc, England with its pound, and the United States with its dollar have all been affected by a shift in currency values. Money does not keep at a uniform rate of exchange or purchasing power; with the crises which come to all nations at some time, debts must follow the ups and downs of the money market. So well known is this fact that many obligations have been contracted to be paid in gold of a certain standard, weight and fineness, and even these contracts, we have said, may be subject to the money regulation

intrusted to Congress. (*Norman* v. *B. & O. R. R. Co.*, 265 N. Y. 37.)

The Soviets, in order to give to their money an exchange value, created the chervonetz bank notes, taking the chervonetz as a standard, worth ten rubles. Having placed its notes or currency on a supposed gold basis, with a reserve of gold to meet them, the ruble became worth fifty-one cents of our money. On the withdrawal of all other paper money, by 1924 the chervonetz bank notes and the State treasury notes became the only circulating medium or legal tender. The plaintiffs' claim, sustained by the referee, is, that all previous obligations, even those created in 1918 and before, were payable " ruble for ruble " in this new gold currency, whereas the day before its creation their obligations were worthless.

If a policy issued by the defendant had been payable in Russia anywhere from 1918 to 1924 the amount to have been paid would have amounted to nothing. If the plaintiffs had rescinded between these dates there could have been no recovery. Every one, both in Russia as well as in other countries, has suffered by the depreciation of money values and by the wiping out of reserves, savings and capital investments. Yet because these plaintiffs elected to rescind after 1924 they are to have their money back with interest as of the ruble value before the war commenced.

Applying the law as stated in *Parker* v. *Hoppe* (257 N. Y. 333), the referee determined that the value of the ruble was to be taken as of the date of rescission, or, after 1925, and as the chervonetz currency was the legal tender at that time, he went no further to determine whether prior obligations were payable ruble for ruble in this currency in Russia. Even he, however, realized the injustice of such a ruling, for he decided that as these plaintiffs had paid their premiums in a depreciated currency they could only recover the exchange value of the ruble as of the date when they had paid the premium.

Surely these parties, by suing here in this State, cannot profit by the shift in jurisdiction and recover here what they could not get in Russia.

We fail to discover in these findings of fact, outside of the rulings of law, any statement that pre-existing obligations in Russia were to be paid in 1924 in the chervonetz gold ruble note, ruble for ruble. On the contrary, when we find, as above stated, that with every shift in the currency there has been an established ratio, according to which pre-existing obligations could be paid in the new currency, and that all pre-existing patterns, both of the 1922 and 1923 pattern, could be redeemed at a certain ratio, there was a clear indication that the 1924 gold ruble was never considered or made to be on a parity with the ruble of pre-existing obligations or the State credit note. The plaintiffs can only recover when they show that by the law of Soviet Russia pre-existing obligations are to be paid " ruble for ruble " in the new chervonetz gold note, or, that there is an established ratio between such gold standard and the pre-existing ruble of the obligation. It is the ruble recovery in Russia — what would they get there — which is sued for here. When established it is translated into our money.

This is the view taken by other courts where this question has arisen, recently by the Circuit Court of Appeals for the Second Circuit (*Tillman* v. *Russo Asiatic Bank*, 51 Fed. Rep. [2d] p. 1023, opinion by Judge AUGUSTUS N. HAND). So, too, *Perry* v. *Equitable Life Assur. Society* (45 Times Law Rep. 468). 1 Sedgwick on Damages ([9th ed. 1912], §§ 268 and 269) gives the following rule: " Where an entirely new standard of value is adopted by the government, the amount to be paid is found by giving such a sum in the new currency as shall be declared by law equal in value to the amount due in the old currency." (See, also, *Succession of Serralles* v. *Esbri*, 200 U. S. 103; *Anderson* v. *Equitable Life Assur. Society*, 42 Times Law Rep. 302; *Heine* v. *New York Life Ins. Co.*, 50 Fed. Rep. [2d] 382.)

The plaintiffs have been somewhat justified in placing their reliance upon *Matter of People (First Russian Ins. Co.)* (255 N. Y. 428), which was followed by the referee, and no doubt is the basis for his conclusion. Like the case of *Buerger* v. *New York Life Assur. Co. (supra)*, there was no contradictory testimony to the very meager statements of the law given by the Russian lawyer-expert. The proceeding was to determine upon a plan to dispose of the surplus moneys in the hands of the Superintendent of Insurance due foreign creditors. All domestic creditors had been paid and a large sum remained to be distributed to foreign claimants. How was it to be done? Many plans were submitted and this court finally had to adopt its own measures. A foreign policyholder named Bermant had been excluded by the courts below as not coming within the class of foreign creditors to be paid and his appeal turned primarily upon this question. On the hearings before the referee a witness had given an outline of the currency values in Russia, including the chervonetz bank notes, as the only existing legal tender money. The point was not contested and no further evidence given or offered. In fact the claimant did not refer to the matter in his principal brief, but in a supplemental brief. The referee made no findings of fact on the currency question. That the determination of this court was to be confined to the record before it Chief Judge CARDOZO gave fair warning. He said: " The decision must be understood to be confined to the record now before us. We do not attempt to say to what extent a different record, exhibiting in a different light the history of the ruble, would exact a different conclusion. In particular we reserve the question whether the insurer would be liable on the basis of the gold coinage if in truth it had an option to discharge the debt in gold or by the same number of rubles in depreciated paper " (p. 432).

The Russian money question has now been fully presented to the court, all the decrees, some of which were not

in the *First Russian* case, are in evidence, and the referee has made exhaustive findings of fact. We feel, as did the judges in the *Tillman Case* (*supra*), who had our decision before them, that the intimation of our chief judge should be followed, and the *First Russian* case not considered as a binding authority in face of a more thorough and, in many respects, different record.

For the reasons here expressed we are of the opinion that, even taking the plaintiffs' view of these cases, they cannot recover. The ruble which they could recover is valueless; they at least have not proved its value in the present Russian currency.

In seven of these cases the referee found for the defendant and dismissed the claims for various reasons. We need not itemize these claims. Sufficient to say that we agree with the referee in his findings. As there could be no recovery in any of these cases under our decision, we need not enter into a discussion of the individual facts.

The judgments of the lower courts should, therefore, be reversed, and the complaints dismissed, with costs in all courts.

LEHMAN, J. (concurring). The defendant issued in Russia policies of insurance payable there. The Soviet government seized the defendant's assets in Russia and compelled it to cease doing business there. Performance of the defendant's contract in Russia has thus been made impossible. The defendant has denied any obligation under its policies. The primary question presented upon this appeal is whether under the law of this jurisdiction the defendant's contractual obligation has been canceled or discharged.

It has not been discharged by performance. It has not been canceled by agreement of the parties. That is conceded. The obligation of the defendant to perform its contracts, or, if performance is frustrated, to make restitution of the consideration paid for which the promised

return has not been given, remains in force, unless, under the law of this jurisdiction, the effect of the decrees of the Russian government is to terminate, cancel or discharge the defendant's obligation.

The problem presented when litigants have resorted to our courts asking for remedy for breach, frustration or repudiation of the obligations of contracts made or to be performed in Russia, or made by Russian corporations, have been varied and difficult. Analogous problems have been presented when rights to property which had a situs in Russia, actual or constructive, have been asserted here. The Soviet government, then a *de facto*, though unrecognized, government, intended to create a new economic order upon the ruins of the established economic order. It seized the assets of corporations which conducted the business of banking or insurance. It terminated the right of such corporations to do business. It confiscated the deposits in banks. It canceled the obligations of insurance companies. It seized and confiscated other forms of private property. Within well-defined territorial limits its decrees had all the force of law. Outside of those limits, the strong arm of the Soviet government could not extend. Until recognition, its decrees were not the law of Russia in a juridical sense. Disregard of their actual force and effect within Russia might work great injustice (*Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149; *Petrogradsky M. K. Bank* v. *National City Bank*, 253 N. Y. 23); enforcement of these decrees here, even if foreign law, might offend our own public policy, or be contrary to our own rules of law. (*Vladikavkazsky Ry. Co.* v. *New York Trust Co.*, 263 N. Y. 369.) In each case presented to our courts the primary question was the effect which should be given to such decrees.

That question could be determined only under the law of this jurisdiction. No foreign government, *de facto* or *de jure*, can change that law. It is, however, a rule

embodied in the law of this jurisdiction that, in some instances, when the subject-matter of an action in our courts is a contractual obligation made or to be enforced in a foreign jurisdiction, or which the parties have agreed shall be governed by the law of a foreign jurisdiction, our courts must ordinarily apply the rules of law of the foreign jurisdiction. Whether our law sanctions the application of rules of law of a foreign jurisdiction in a particular case is a question of domestic law. What are the rules of law of a foreign jurisdiction applicable in such case, is a question of fact. (*Hutchinson* v. *Ross*, 262 N. Y. 381.) Intricate questions of whether rules of law of a foreign jurisdiction shall be applied, where there is conflict of law, have often been presented to the courts of this and other jurisdictions. Decisions in these cases have resulted in the gradual creation of definite rules generally accepted as in accord with the comity of nations. These rules are based on public policy, and are part of the law of this jurisdiction. They apply, however, only to foreign law in its true sense; that is, to rules made by a sovereign government recognized by our own government. Decrees which offend our own public policy and decrees which are made by a government which we do not recognize lie outside of their scope.

Recognition of the Soviet government was long delayed. The avowed purpose of that government, to destroy private rights of property and cancel private contracts, offended our own public policy. We might refuse to regard these decrees as the law of Russia; until recognition, we might regard them as the fiat of an usurping and illegitimate power. None the less, they were issued by a power which effectually governed Russia. That power could enforce obedience to its fiat there. Within the territory subject to its sway, and upon the persons subject to its might, the decrees of the Soviet government have had, even before recognition, all the force and effect that the law of a recognized government would have. Recog-

nition of the Soviet government is " retroactive in effect
and validates all the actions of the government so recog-
nized from the commencement of its existence." (*Sali-
moff & Co.* v. *Standard Oil Co.*, 262 N. Y. 220, 223.)    A
legitimate sovereign rules over Russia, and all its decrees
are law.

The contracts of the defendant were made in Russia.
The parties stipulated for performance in Russia.    The
defendant could not engage in the business of insurance
in Russia or issue its policies there without the permission
of the Russian government.    For the grant of such per-
mission the Russian government exacted conditions which
form part of the defendant's contracts.    These con-
ditions included the deposit in Russia of security for the
performance of the defendant's obligations and of reserves,
based on actuarial tables, sufficient to enable it to meet
its obligations there.    The Russian government retained
the right to compel the defendant at any time to liquidate
its business.    For such purposes the defendant's obliga-
tion had a situs in Russia and was subject to Russian
law.    Moreover, the parties understood and agreed that
the stipulated performance in Russia should be governed
by Russian law.

The Soviet government decreed the " liquidation "
of the defendant's business in Russia.    It forbade the
performance there of its obligations and seized its assets
deposited there   for   the   performance   there   of   these
obligations.    There is evidence that the Russian decrees
were not intended to cancel these obligations; that their
purpose was only to frustrate performance in Russia.
The distinction seems unimportant.    The decrees of the
Soviet   government   effectually   rendered   performance
impossible in Russia.    We may assume, as the defendant
contends, that the intended effect of the decree was
cancellation of the obligation, so far as the Soviet govern-
ment had power to cancel.    Even so, the Russian govern-
ment could not decree cancellation which would be effec-

tive beyond its borders, except in so far as the courts of other jurisdictions choose to give effect to such a decree.

The problem now presented would be simple if the sole situs of the defendant's obligation had been in Russia and resort was had to our courts for remedy of a wrong arising in Russia, or for vindication of property or contractual rights there. (Cf. *Salimoff & Co.* v. *Standard Oil Co., supra.*) For some purposes the situs of the defendant's obligation was in Russia; not for all. The defendant is a domestic corporation. Seizure of its assets and termination of its privilege of doing business did not end its contractual obligations. Though with one exception all the assured were residents or subjects of Russia at the time the policies were issued, many of them had ceased to be subjects or residents of that country at the time the Soviet government decreed cancellation of the obligations due to them. We have said in similar circumstances, " The intangible chose in action, at least when it is the result of a deposit in a bank, has for some purposes a situs at the residence or place of business of the debtor, though the creditor be far away." (*Sokoloff* v. *National City Bank*, 239 N. Y. 158, 169.) That is true, to at least the same degree, where the intangible chose in action is a promise to pay insurance in a foreign jurisdiction. In this case, indeed, that legal principle is fortified by the express agreement of the defendant that its assets everywhere should constitute a guaranty of the " exact fulfillment" " of its obligations in Russia. Thus even though Russia seized and confiscated the defendant's assets in Russia which were intended under Russian law to constitute the fund out of which the defendant's insurance policies payable there should be satisfied, the defendant's other assets could still be used to meet its obligations in Russia, and the defendant did so expressly agree. To that extent at least the defendant's obligation has a situs here. We have already so decided in respect to bank deposits in the Russian branch of a domestic bank-

ing corporation. (*Sokoloff* v. *National City Bank,* 239 N. Y. 158; 250 N. Y. 69.) We have so decided in respect to the policies of this defendant. (*Sliosberg* v. *New York Life Ins. Co.,* 244 N. Y. 482.) There we held that the defendant's contractual obligation had its " source and sanction " in the laws of this State, and that, therefore, even this State could not under the Constitution of the United States impair that obligation. Now we are told that under the common law of this State a foreign State may by its decree impair, cancel and destroy the obligation which is situated here and which finds source and sanction in our law. From that conclusion I am constrained to dissent. (See, also, *Severnoe Securities Corp.* v. *London & Lancashire Ins. Co.,* 255 N. Y. 120; *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U. S. 204.)

The argument is pressed that those cases have lost force because there the question was the effect of the decrees of a government which had not been recognized, while here the question is the effect of the same decrees after the government has been recognized. The distinction should not carry any practical consequences in this case.

From the outset this court, faced with a new problem created by the decrees of the Soviet government, has attempted to meet that problem realistically. Even before the Soviet government was recognized, where its decrees " have actually attained such effect as to alter the rights and obligations of the parties in a manner we may not in justice disregard," our courts have recognized the practical effect of such decrees " regardless of whether or not they emanate from a lawfully established authority." (*Russian Reinsurance Co.* v. *Stoddard, supra,* p. 156); *Salimoff & Co.* v. *Standard Oil Co., supra.*) In that case we held that even confiscatory decrees of an unrecognized *de facto* government result in divestment of title to property which had a situs in the territory subject to the sway of the unrecognized government.

The courts of England have at times reached opposite result. In so far as the case of *Luther* v. *Sagor & Co.*

([1921] 3 K. B. 532) indicates that, until recognition, a confiscatory decree of a *de facto* government cannot be given the effect of divesting the title of the original owner to property within the territory ruled by the *de facto* government, this court has refused to follow it. (*Salimoff & Co.* v. *Standard Oil Co.*, *supra*.) The test which we applied in recognizing or disregarding the effect within Russian territory or upon Russian nationals of the decrees of the Russian government before its recognition was that of justice and public policy. Recognition did give the Soviet government, under our law, an international standing which it did not have before. Even so, we have applied the same test after recognition as before, and have refused to give extraterritorial effect to a Soviet decree of confiscation, though recognition had " validated " its decrees. (*Vladikavkazsky Ry. Co.* v. *New York Trust Co.*, *supra*.) In that case we even pointed out that the basis of previous decisions was not the lack of recognition, but the fact that confiscatory decrees offended our own public policy.

We are told, nevertheless, that even though the defendant's obligation to use its assets here in " exact fulfillment " of the terms of the Russian policies had a situs here, when the law of Russia canceled the obligations embodied in the policies, and which were to be performed in Russia, or made performance there impossible, the result was, necessarily, the complete discharge of the defendant. The argument seems to be that the law of Russia governs performance of the defendant's obligation there; that the Soviet decrees constitute the law of Russia; that under the Russian law the defendant has committed no breach of contract there; and that, therefore, the defendant's obligation under its policies including its obligation to use its assets everywhere in " exact fulfillment " of the terms of the policy is automatically satisfied or discharged. That might be true if the Russian decrees had regulated performance. They did more.

They annulled the agreement. We cannot say that the agreement of the parties contemplated that the contractual obligation might be annulled by Russian law without even equitable restitution of the consideration paid for performance, unless we ignore the actual intent of the parties. We cannot hold that Russian law can relieve the defendant of an obligation for which it has received payment unless we give Russian law an extraterritorial effect which under our own law we are not required to accord to foreign law. The obligation of exact fulfillment remains in force. That obligation has been repudiated or breached. Right to restitution or damages still remains. It has not been discharged by confiscation of the obligation due to the assured, for a confiscatory foreign law offends our public policy and cannot constitute excuse for restitution or performance here. It has not been discharged by confiscation of the assets of the defendant in Russia, for the assured have the right under the policies to look to the assets of the defendant here for fulfillment of the obligation.

Judge Crane's conclusion rests, in my opinion, upon premises which are entirely fallacious. A majority of the assured, even though Russian citizens at the time the policies were issued, were *not* subjects of Russia domiciled there when the decrees were made. The insurer was *not* a Russian corporation. The obligation of the insurer followed it wherever the insurer could be found. It was, therefore, *not* intangible property *within* Russia and the Russian government did *not* have the same dominion over it as it had over tangible property situated there. So we decided in *Sokoloff* v. *National City Bank* (*supra*). The circumstance that there the contract was made in New York might be relevant upon questions concerning the validity or interpretation of the contract. It is irrelevant upon the question of the situs of the obligation embodied in such contract. (*Sliosberg* v. *New York Life Ins. Co., supra.*) What was said and

decided in *Security Sav. Bank* v. *California* (263 U. S. 282) is entirely in accord with such conclusion.

The Soviet did *not* order the liquidation of the defendant's business in Russia " within the very terms of these policies. of insurance." Those terms were that upon order of the Russian government the insurance company " must immediately liquidate its business in Russia and *settle* its accounts with the assured in the manner that shall be indicated to it by the Russian government." The decree of the Soviet government did *not* provide for settlement of the defendant's accounts with the assured. The object of these actions is to obtain such settlement.

The Soviet government did *not* assume the contractual obligation of the insurance company. It canceled the contract and confiscated the consideration paid to the defendant in return for the defendant's promise. Under the law of this State, extraterritorial effect would *not* be given to such a decree even if it had been made by the Imperial government of Russia. (*Frenkel & Co.* v. *L' Urbaine Fire Ins. Co.*, 251 N. Y. 243.) The circumstances that in that case the contract was held by one of our citizens and was to be performed here furnish no ground of distinction; for here too most of the contracts were held by persons not domiciled in Russia, and the defendant's obligation had, at least for some purposes, a situs here. (Cf. *Sokoloff* v. *National City Bank, supra.*)

The decrees of the Soviet government did *not* regulate performance in Russia of the defendant's obligation. They wiped the agreement out and annulled its obligation. No rule of conflict of laws, no agreement of the parties that the contract shall be governed by Russian law, permits us to give effect to such a decree upon an obligation which has a situs here. (*Sokoloff* v. *National City Bank, supra.*)

Our earlier decisions, and they are many, refusing to give extraterritorial effect to the decrees of the Soviet

government were *not* based on lack of recognition. So we expressly said in *Vladikavkazsky Ry. Co.* v. *New York Trust Co.,* 263 N. Y. 369. Even before recognition, we decided, contrary to the views expressed in *Luther* v. *Sagor & Co.* (*supra*), that a confiscatory decree of the Soviet government of property situated in Russia results in transfer of title. (*Salimoff & Co.* v. *Standard Oil Co.,* 262 N. Y. 220.) Even after recognition, we have decided that they were ineffective to destroy rights to property, tangible or intangible, with a situs elsewhere. Thus every claim that has been urged by the defendant and is sustained in the opinion of Judge CRANE, has been rejected by previous decisions of this court. It has been rejected by the actual decisions. What was said furnishes the ground for what was decided, and no other sound ground for such decisions is suggested. Those decisions lead inevitably to the conclusion that though the confiscatory decrees of the Soviet government are the law of Russia, and may excuse performance of, or divest title to, an obligation in Russia, they have no such effect upon the obligations which have a situs elsewhere or upon persons not subject to Russian law.

Assuming that the plaintiff has a cause of action, the question of how recovery shall be measured still remains. The policies provide for payment of premiums by the plaintiffs to the defendant and of insurance by the defendant to the plaintiffs in rubles. All the currency or treasury notes issued prior to 1924 have become valueless and have been withdrawn from circulation. The only legal tender are rubles issued thereafter, and ruble obligations payable in Russia can be met only by payment of such legal tender. The defendant maintains that the plaintiff's recovery must be measured by the value of the ruble notes which have been retired. The plaintiffs maintain that recovery should be measured by the value of the rubles which are now legal tender.

The plaintiffs are suing for Russian rubles. In the

courts of this State, recovery must be measured by the exchange value of the same rubles on the day upon which each assured was entitled to receive payment. (*Parker* v. *Hoppe*, 257 N. Y. 333; 258 N. Y. 365.) Fluctuations in the value of a foreign currency between the date when an obligation was incurred and the date when payment in foreign currency must be made, must be disregarded. The problem presented in this case is whether the rubles which now constitute the currency in circulation in Russia are the rubles or currency which under these policies the defendant is obligated to pay to the assured. The mere fact that they are called by the same name is not decisive. The test is whether the defendant was obligated to pay that kind of rubles to meet its obligation. In *Matter of People (First Russian Ins. Co.)* (255 N. Y. 428) we held, upon the record then presented to us, that the sum due to the assured should be computed upon the basis of the value of the newly-issued rubles.

The question involved is one rather of fact than of law. If the ruble now in circulation is not the same Russian credit value or legal tender paper currency in which, as the referee has found, all life assurance operations were to be effected, but an entirely new currency — or if the insurer still had an option to pay in a depreciated currency — then our decision in the earlier case was erroneous. In reaching that decision we were conscious that in some other case amplification of testimony on such points might result in change of decision, and the decision is coupled with an express *caveat* in that regard.

The record in the present case is much fuller. True, the picture presented is not very different, but the argument and brief of the appellant in this case sheds clearer light upon the problems involved. In such circumstances, and especially in view of the *caveat* contained in Judge CARDOZO's opinion in the earlier case, we should now reconsider the questions which we have previously decided.

The evidence establishes, and the referee has found, that when these policies were issued the decrees of the Imperial Russian government provided that all life insurance operations were to be effected in "Russian credit value," which means "legal tender paper currency Russian rubles, and not gold or silver." During most of the period when the assured paid premiums upon the policies these legal tender rubles had an exchange value of approximately fifty-one cents. After the outbreak of the war the exchange value of these rubles began to decline. Beginning with the fall of the Imperial government in 1917, the decline became precipitate. Successive governments issued new State credit notes which circulated side by side with the credit notes issued by the Imperial government. The printing presses were kept busy, until there were so many rubles in circulation that no ruble had any appreciable value. That was the situation in Russia at the time when, it is alleged, the defendant repudiated obligation under its Russian policies. About that time the Soviet government began the issue of a " new pattern " of notes, but the old treasury note continued to circulate side by side with the " new pattern " note, though in a ratio of equivalence which left them only an infinitesimal value. After 1924 the old treasury notes were no longer in circulation but provision was made for their exchange for new currency at the established ratio of equivalence. The findings set forth in the opinion of Judge CRANE trace the downward course and the steps taken by the Soviet government for the purpose of obtaining a stable currency of the same value, measured in gold, as the pre-war currency. They show that at the time of the beginning of this action Russia again had a currency with an exchange value of approximately fifty-one cents for each ruble.

Where a State substitutes a new currency for a currency which has become depreciated, considerations of economic expediency will ordinarily dictate a provision

for the measurement in the new currency of obligations payable in the old currency. Otherwise a debtor might be saddled with an obligation far greater than was contemplated when the obligation was incurred. The absence of such provision might perhaps indicate that the State did not create a new currency as a substitute for a depreciated currency, but merely rehabilitated the old currency. The economic system of the Russian government is unique among the nations of the world. It does not permit the enforcement of private obligations entered into before 1917, and the field is very limited in which private obligations for the payment of money are now recognized. Thus absence of provision for the liquidation in the new currency of obligations otherwise payable in a depreciated currency has not the usual significance. Counsel has called our attention to the case of *Titova* v. *Agricultural Assn.* (Civil Cassation Department of the Supreme Court), in which the court decided that a loan made in 1918, when the ruble still had some value, and coming due in 1921, when the value of the ruble was infinitesimally small, could be discharged only by a payment measured by the value of the loan when made. The problem presented in that case is, however, quite different from the problem presented here, and the diligent search of counsel for the plaintiffs has failed to disclose any case arising in Russia which has any direct bearing on that problem. Indeed, there is little use for currency under the economic system of Russia, except for the purchase of articles intended for enjoyment or consumption. Currency must be spent or saved, and when the Soviet government made a new issue of currency it fixed the ratio of equivalence of the old issues of currency to the new and thus fixed the rights of the holders of the old currency.

The obligation of the defendant at its inception could be discharged by payment of imperial rubles. When new issues of rubles were made, the defendant's debt was

payable either in imperial rubles or in rubles of the new issues. All these rubles depreciated until they were without value. The result was that the obligation to the assured by the insurer, payable in valueless rubles, was also valueless. Then the Soviet government created a new form of currency and exchanged the old currency for the new currency, but at a rate which left to the old currency only an infinitesimal value. That is not a rehabilitation of the old currency. It is a destruction of the old currency and a substitution of a new and different currency. The new currency thus furnishes no measure of the value of the obligation payable in the old currency. That was destroyed when the currency in which it was payable became valueless.

The question is not before us whether the ratio of equivalence fixed by Soviet decree for the exchange of the old ruble, in which defendant's obligation was payable, constitutes the fair measure of the value of defendant's obligation. If that decree arbitrarily destroyed the value of the old currency, its indirect effect would be the cancellation or destruction of the defendant's obligation. The record in this case shows that even before these decrees were issued, the old ruble was for all practical purposes, valueless. That was not the result of a confiscatory decree, but of unrestrained inflation. For loss so sustained our law furnishes no remedy. That was true before the Soviet government was recognized; it is true now.

We can measure the value of the defendant's obligation only upon the basis of the value of the currency in which it was payable. Even if we had power to measure it by some more equitable standard we should have difficulty in fixing such standard. In *New York Life Ins. Co.* v. *Statham* (93 U. S. 24, 34) the court held that where failure to pay premiums on an insurance policy at the stipulated time would result in a forfeiture of premiums already paid upon the policy, an insured should be relieved

of the forfeiture when the failure is caused by a public war, saying: " The insured has an equitable right to have this amount [the premiums] restored to him, subject to a deduction for the value of the assurance enjoyed by him whilst the policy was in existence; in other words, he is fairly entitled to have the equitable value of his policy." Here the defendant was required to leave such equitable value in Russia. It has been confiscated by the Russian government, but even if it had not been confiscated it would itself have become valueless by reason of the depreciation of the ruble. Thus, even though events have rendered performance of the defendant's obligation valueless, the same events have rendered valueless the consideration received by the defendant.

For these reasons I concur in the reversal of the judgments.

POUND, Ch. J., O'BRIEN, HUBBS and CROUCH, JJ., concur with CRANE, J.; LEHMAN, J., concurs in result in opinion in which LOUGHRAN, J., concurs.

Judgments reversed, etc.