MARCEL M. HOLZER, Plaintiff, *v.* DEUTSCHE REICHSBAHN GESELLSCHAFT and Others, Defendants.

Supreme Court, Special Term, New York County, June 22, 1936.

*Wachtell, Manheim & Grouf,* for the plaintiff.

*Child & Handel,* for the defendants.

COLLINS, J. This challenge by the plaintiff to the legal sufficiency of the separate defenses poses, *inter alia,* the vastly arresting and significant question concerning the recognition and respect by our courts of the confessed discrimination against the Jews practiced by the German government.

Though that policy be repugnant to our concept of elementary justice, does the law of comity compel us to honor it, or may we inquire into the morality of the policy, and, finding it immoral, refuse to accord it faith and credit? May the light of our public policy be shed on the law of a foreign jurisdiction, or are we forced to embrace the latter law blindly? Where the law clashes with the humanities, which shall prevail? These are a few of the salient questions which this motion propounds and which we are called upon to resolve.

The suit is by a German Jew against the corporate owners of the German forwarding, transportation and warehousing system known as Schenker & Co., one of the defendants. The complaint alleges that this system is owned or controlled, directly or indirectly, by the other defendants, one of them Deutsche Reichsbahn

Gesellschaft, hereinafter referred to as Reichsbahn, and whose separate defenses are here assailed. The Schenker system operates in approximately two hundred cities in Europe, Asia and America. The complaint contains two causes of action. The suit is for breach of an employment contract, the plaintiff averring that prior to 1933 the defendants employed him as general executive manager of their entire system for three years beginning January 7, 1932, at a minimum salary of 72,000 marks per annum, plus a bonus graduated by the annual turnover of the enterprise. The agreement provided that " in the event the plaintiff should die or become unable, without fault on his part, to serve during the period of the contract the defendants would pay to him or to his heirs the sum of 120,000 marks, in discharge of their obligation under the hiring." The complaint asserts that " on or about the 21st day of June, 1933, the defendants discharged the plaintiff as of October 31st, 1933, upon the sole ground that the plaintiff is a Jew." Due performance on plaintiff's part is affirmed and damages in the sum of upwards of $50,000 demanded.

The second cause contains the same preliminary allegations as the first and charges that " In the month of April, 1933, after the coming into power of the present German Government, the plaintiff was seized by the agents of that Government and unlawfully incarcerated in prison and in a concentration camp where he was held, without indictment, and without trial, for about six months." This imprisonment, so it is claimed, stemmed from the policy of the German government banishing Jews from certain positions. Because of the enforcement of that policy the plaintiff, and without any fault of his own, was prevented from continuing his services to the defendants, which situation, it is alleged, entitled the plaintiff to the 120,000 marks provided for in case of his inability to perform without fault on his part.

Jurisdiction of defendant Schenker was acquired by attaching its property in this forum. Schenker's motion to vacate the attachment was denied by Mr. Justice McLAUGHLIN on February 4, 1936, and such denial was affirmed (247 App. Div. 786). Thereupon defendant Reichsbahn moved to vacate the attachment and to dismiss the complaint and that motion was denied by Mr. Justice McCook (N. Y. L. J. April 11, 1936, p. 1839). An appeal from the latter decision is pending.

The answer of Reichsbahn admits the employment, and admits the discharge and internment because the plaintiff is a Jew. The answer then advances three affirmative defenses.

The first defense contends that this court " has no jurisdiction of said defendant or of any property thereof or of the plaintiff's

alleged cause of action because (¶ 17): Said defendant and all the property thereof have the status of State property of the Government of Germany and with respect thereto said Government is entitled in this action to all the rights, privileges and immunities of sovereignty since said Government is a recognized independent sovereign power at peace with the United States of America."

This defense then asserts that such sovereign immunity is recognized by our government and by the treaty between the United States and Germany, restoring friendly relations, proclaimed November 14, 1921, which by article II thereof, incorporated therein article 281 of part X of chapter V of the treaty of Versailes, and which treaty excepts sovereign immunity only (¶ 18) " If the German Government engages in international trade, it shall not in respect thereof have or be deemed to have any rights, privileges or immunities of sovereignty."

The defense proceeds to allege that Reichsbahn is not within the limitation of said treaty, and that (¶ 19) " said defendant and all of its property are entitled to complete immunity from suit and process in this action under said Treaty, since said defendant is not a trading company or commercial enterprise and neither said defendant nor any of the property thereof is or was engaged, used or employed in international trade or in any business between the territories of Germany and the United States or any part thereof."

The first defense concludes (¶ 20): " Said defendant is a corporation duly and specially created by the Government of Germany and organized and existing under and by virtue of certain special statutes of Germany known as the Reichsbahngesetz of August 30, 1924, as amended March 13, 1930, as an instrumentality of said Government, for the purpose of operating, and is operating the Governmental railroad system of the German Government in Germany in behalf of that Government and said Government is the sole owner of said defendant and of all of the common stock of said defendant and said defendant and all property thereof are State property of the Government of Germany, devoted to public use, and are owned, controlled, administered, managed and operated under the direction and control of said Government."

The second affirmative defense avers that the contract sued on " was made and was to be performed in Germany and was terminated in Germany, and was and is governed by the laws of Germany." It then undertakes to plead the law of Germany by alleging (¶ 24): " Said laws, decrees and orders required, among

other things, the retirement of various classes of officials and employees, including certain classes of persons of non-Aryan descent, from the service of the German states, municipalities, municipal associations, bodies corporate under public law, and from institutions and enterprises and corporations of like rank, including said defendant, and prescribed the amounts that could lawfully be paid to such persons upon and after such retirement."

" The plaintiff was of non-Aryan descent and was within the classes specified and required to be retired by said laws and decrees and orders of said Government, and the plaintiff was duly retired, and the hiring of the plaintiff referred to in the complaint and the agreement therefor and the plaintiff's employment thereunder were duly and lawfully terminated and were required to be terminated as of October 31, 1933, under and pursuant to the said Law, said Second Decree and said orders, and the further performance of the plaintiff's alleged contract of employment by all parties thereto was thereby prohibited and made unlawful, excepting only that there was permitted to be paid to the plaintiff the sum of 10,000 marks per month for the fourteen months thereafter terminating on December 31, 1934." (¶ 25.)

The third and last separate defense endeavors to plead an accord and satisfaction or payment by declaring (¶ 28): " The plaintiff duly received and accepted the aforesaid sums in full payment and in accord and satisfaction of any and all compensation and payments and of any and all rights of the plaintiff under his aforesaid hiring and employment and of any and all rights of the plaintiff by reason of or in connection with his alleged contract, hiring, employment and discharge, and has been duly paid in full."

It is the validity of these separate defenses which the plaintiff's motion under subdivision 6 of rule 109 of the Rules of Civil Practice disputes.

On the theory that even a bad answer is unassailable as a defense to a bad complaint (*Salimoff & Co.* v. *Standard Oil Co.*, 237 App. Div. 686, 688), Reichsbahn asserts that the plaintiff's motion should be denied because the complaint is fatally defective in that the allegation of performance is inadequate, in that there is a failure to show jurisdiction, and in that it appears that the court is without jurisdiction as to Reichsbahn.

The complaint, however, has three times been judicially scrutinized and inferentially approved. An order of publication was — as indeed it must be — " founded upon a verified complaint showing a sufficient cause of action against the defendant." (Civ. Prac. Act, § 232.) Mr. Justice McLAUGHLIN's declination to vacate the warrant of attachment and the order of publication

lent validity to the complaint. (*Paget* v. *Stevens*, 143 N. Y. 172; *Ebsary Gypsum Co.* v. *Ruby*, 256 id. 406.) The complaint was again before the court on appeal from Mr. Justice McLaughlin's order, and still again before Mr. Justice McCook. As stated, the motion before Mr. Justice McCook was by Reichsbahn and specifically sought a dismissal of the complaint because of the defects now urged. But apart from these previous holdings, the complaint, I find, states a good cause of action. (*Kronman & Co., Inc.,* v. *Public National Bank*, 218 App. Div. 624.)

The separate defenses will be explored in their inverse order rather than seriatim, because the troublesomeness of the questions seems to me to rate according to the inverse order.

(1) "*Accord and satisfaction.*

" An accord is a contract (not merely a revocable offer nor a bargain invalid for lack of sufficient consideration or any other reason) between creditor and debtor for the settlement of the claim by some performance other than that which is due. \* \* \* Satisfaction takes place when the accord is performed." (Restatement of the Law of Contracts, § 417, comment a.)

Thus, to constitute an accord and satisfaction, all the elements of a contract must emerge. (*Komp* v. *Raymond*, 175 N. Y. 102.) Several of these contractual elements are absent here. The basic requirement of assent is not alleged, nor indeed could it be truthfully alleged, because this plaintiff was utterly without freedom to contract; he was divested of will. It was by " decrees and orders " of the German government that the plaintiff was paid 10,000 marks (Answer, ¶ 25). To call this a contract or an " acceptance " is a perversion of terms. The plaintiff was abjectly helpless. Nor is consideration alleged. (*McGovern* v. *City of New York*, 234 N. Y. 377; *Goffe* v. *Jones*, 132 App. Div. 864.) Mutuality must be averred. (*Goldfield* v. *Foster & Co., Inc.*, 227 App. Div. 543; *Grossman* v. *Schenker*, 206 N. Y. 466.) Since the answer shows that the sum paid was less than the amount due, a *bona fide dispute* of the debtor's liability must appear. (*Mance* v. *Hossington*, 205 N. Y. 33; *Nassoiy* v. *Tomlinson*, 148 id. 326; *Fuller* v. *Kemp*, 138 id. 231.) There is no such showing. As a plea of payment the third defense is equally vulnerable; the payment of a smaller sum than the one claimed does not constitute payment.

I conclude that the third separate defense is legally insufficient and it is ordered stricken out.

(2) *Must discharge of the contract, pursuant to German law, be honored here?*

The plaintiff's affidavit in support of the attachment warrant reveals that the plaintiff is now a resident of Westchester county,

N. Y., and has a place of business at No. 29 Broadway, city and county of New York. Concededly, however, the contract sued on was made, executed and to be performed, partially at least, in Germany. It was terminated there by fiat of the German government. We proceed from the indubitable premise that "The law of the place of performance generally governs the contract and its discharge." (*Dougherty* v. *Equitable Life Assurance Society,* 266 N. Y. 71, 80; Restatement, Conflict of Laws, § 385; *Zimmermann* v. *Sutherland,* 274 U. S. 253; 47 S. Ct. 625.)

The general rule is stated in the leading case of *Pritchard* v. *Norton* (106 U. S. 124, 129) thus: "The principle is, that whatever relates merely to the remedy and constitutes part of the procedure is determined by the law of the forum, for matters of process must be uniform in the courts of the same country; but whatever goes to the substance of the obligation and affects the rights of the parties, as growing out of the contract itself or inhering in it or attaching to it, is governed by the law of the contract." (*Vander Horst* v. *Kittredge,* 229 App. Div. 126.)

It has been noted that this court, through Justices McLaughlin and McCook, has accepted jurisdiction of this case and that the plaintiff now resides in this State.

"Once properly in court and accepted as a suitor, neither the law nor court administering the law, will admit any distinction between the citizen of its own State and that of another." (*Hibernia National Bank* v. *Lacomb,* 84 N. Y. 367.)

"We have refused to adopt the distinction made in some of the States, and have placed the right of a creditor coming here from the State of a common domicile upon the same footing as that of a citizen or resident creditor." (*Barth* v. *Backus,* 140 N. Y. 230.)

It is also a doctrine deeply embedded and generally applied that "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." (*Underhill* v. *Hernandez,* 168 U. S. 250, 252; 182 S. Ct. 83, 84; quoted with approval, *Dougherty* v. *Equitable Life Assurance Society,* *supra; Wulfsohn* v. *Russian Socialistic Federated Soviet Republic,* 234 N. Y. 372, 376.)

Of course, if the rule of *lex loci contractus* is inexorable, our examination has attained its terminus. But is the doctrine unyielding though its enforcement be cruel, immoral, indecent or violative of fundamental freedom? Does comity bar us from inquiring into the justice of the law we are entreated to wield? Have we no choice?

The plaintiff has applied to our courts for redress. Reichsbahn says that he is not only not entitled to that redress but that he may not even be heard because the law of Germany forbids. Is that sufficient to halt the inquiry? The answer resides in our own law, not that of Germany.

In *Straus & Co.* v. *Canadian Pacific Railway Co.* (254 N. Y. 407), where the court was considering a clause in a bill of lading which provided that it should be construed according to the laws of Great Britain, the court, rejecting the laws of Great Britain as contrary to the public policy of this State, appositely said (at p. 414): "As a general rule, the validity of a contract is determined by the law of the jurisdiction where made, and if legal there is generally enforcible anywhere. *There is, however, a well established exception to the rule to the effect that a court will not enforce a contract though valid where made if its enforcement is contrary to the policy of the forum.*" (Italics mine.)

And Judge CRANE, in the *Dougherty Case* (*supra*), now leaned on so heavily by Reichsbahn, makes the significant observation that " Recognition does not compel our courts to give effect to foreign laws if they are contrary to our public policy."

Judge CRANE then proceeded to examine the law of Soviet Russia, which ordered the dissolution of private insurance companies and which assumed on behalf of the Soviet: " All obligations of the defendant arising under its Russian policies of insurance, including the policy in suit." He concluded that: " It cannot be against the public policy of this State " to enforce the agreement which made it subject to Russian law.

The capital point of that holding is that the law of Russia was compared with our own public policy; inquiry was not forestalled by the mere assertion of the law of Russia.

Again, in *Salimoff & Co.* v. *Standard Oil Co.* (262 N. Y. 220) Chief Judge POUND gave recognition to the principle that our " own public policy " will be considered in applying foreign law.

And in *Vladikavkazsky Ry. Co.* v. *N. Y. Trust Co.* (263 N. Y. 369) Judge HUBBS wrote: " Where there is confliction between our public policy and comity, our own sense of justice and equity as embodied in our public policy must prevail."

Further, Judge CARDOZO, in *James & Co.* v. *Second Russian Insurance Co.* (239 N. Y. 248) said: " The decree of the Russian Soviet government nationalizing its insurance companies, has no effect in the United States unless, it may be, to such extent as justice and public policy require that effect be given. * * * We think its attempted extinguishment of liabilities is *brutem fulmen,* in England as well as here, and this, whether the government attempting it has been recognized or not. Russia might terminate the

liability of Russian corporations in Russian courts or under Russian law. Its fiat to that effect could not constrain the courts of other sovereignties, if assets of the debtor were available for seizure in the jurisdiction of the forum."

A familiar class of cases where our own public policy prevails over that of a foreign or sister State is that involving marriage and divorce and the legitimacy of children. Not infrequently have our courts denied recognition to a divorce or a marriage, though valid where granted or entered into. There have been instances of children legitimate in one State and bastards in others. (*Berney* v. *Adriance*, 157 App. Div. 628, 630.) This right of the State to accord recognition to a divorce granted by another State, despite the " full faith and credit " clause of the Federal Constitution, has been upheld by the United States Supreme Court (*Atherton* v. *Atherton*, 181 U. S. 155; *Haddock* v. *Haddock*, 201 id. 562; *Thompson* v. *Thompson*, 226 id. 551).

In *Kaiser* v. *Kaiser* (192 App. Div. 400; affd. without opinion, 233 N. Y. 524) a New York wife established a residence in Pennsylvania to obtain a divorce from her New York husband. After being divorced in Pennsylvania (the husband was served by publication) she remarried in that State; whereupon the first husband sued her in New York for divorce, naming the second husband as corespondent, on the basis that New York did not recognize the second marriage and that, accordingly, she dwelt in adultery with her second husband. Though the second marriage was performed in Pennsylvania, and binding there, and though the living together was not adulterous in Pennsylvania, the second husband prevailed in his New York action. Said the court (at p. 403): " The learned counsel also argues that we should give consideration to the fact that the second marriage of the defendant was solemnized in the State in which the decree was granted, and hence valid in that State and as a matter of public policy the courts of this State should recognize the decree obtained in that State. *To do so would destroy entirely the rule of our public policy.*" (Italics mine.)

Quite true, the basis of the *Kaiser* holding was that the first husband " at the time of the action in a foreign State," " was a citizen of this State " and, therefore, that decision is not a precise pattern for this case. Nevertheless, it emphasizes the principle that a foreign law will not be enforced by our courts if the public policy of this State conflicts.

Suppose A and B formed a pact in the foreign land of C, whereunder B was to perform an act which was perfectly lawful in C but which constituted a crime in New York. For the act B was to receive funds of A on deposit in New York. Would the New York courts aid B in forcing the depository to turn over the funds?

Suppose E left a wife in New York and established a residence in F, where polygamy is lawful. His wife sues him for divorce in New York charging concubinage in F. Could the law of F, permitting polygamy, be availed of as a defense to the New York action?

Let us ponder a query nearer the target. Suppose the German law declares forfeited to the German government all property of German Jews, wherever the property be situated. A Jew in Germany has securities in a New York vault. Would the courts of New York aid the German government in enforcing the German law and order the securities of the German Jew delivered to the German government?

To ask these questions is to answer them. I do not perceive that it makes any difference that in one case the German government would be asking our courts for affirmative action in its favor whereas in the other it would be asserting the German law to prevent our courts from taking adverse action. In both instances the pivotal issue would be: are we to enforce the German law? If " What is sauce for the goose is sauce for the gander " is a rule of fair play, are we to hold that the rule has no place in our law?

The Restatement of the Law of Conflict of Laws (§ 120) declares: " If a status is created by the law of one State which is not regarded as a status by the law of another State, no effect will be given to the status as such in the second State." The Restatement defines status in section 119 thus: " In the Restatement of this subject, a ' status ' means a legal personal relationship, not temporary in its nature nor terminable at the mere will of the parties, with which third persons and the State are concerned."

An illuminating case is *Lemmon* v. *People* (20 N. Y. 562). In 1852 Mrs. Lemmon, of Virginia, proceeded to Texas via New York, with eight negro slaves. Slavery was lawful in Virginia but not in New York. Upon her arrival in New York a free negro, as next friend, obtained a writ of habeas corpus which was sustained.

While acknowledging the right of Virginia to maintain the system of slavery, the court, in a memorable decision, refused to recognize the system as binding on or extending to New York. Said the court (pp. 617, 630, 631):

" I do not say that she may convert any description of her free inhabitants or citizens into slaves; for slavery is repugnant to natural justice and right, has no support in any principle of international law, and is antagonistic to the genius and spirit of republican government. Besides, liberty is the natural condition of men, and is world-wide: whilst slavery is local, and beginning in physical force, can only be supported and sustained by positive law.

' Slavery  *  *  *  not only violates the laws of nature and of
civil society; it also wounds the best forms of government; in
a democracy where all men are equal slavery is contrary to the
spirit of the Constitution.'  *  *  *

" Instead, therefore, of recognizing or extending any law of comity
towards a slave holder passing through her territory with his slaves,
she [the State of New York] refuses to recognize or extend such
comity, or allow the law of the sovereignty which sustains the
relation of master and slave to be administered as a part of the law
of the State.  *  *  *

" If there were no actual legislation reaching the case of slavery
in transit, the policy of the State would forbid the sanction of law,
and the aid of public force, to the proscribed *status* in the case of
strangers within our territory.  It is the *status*, the unjust and the
unnatural relation which the policy of the State aims to suppress
and her policy fails, at least in part, if the *status* is to be upheld
at all.  *  *  *

" The public law exacts no obligation from this State to enforce
the municipal law which makes men the subject of property; but
by that law the strangers stand upon our soil in their natural
condition as men.  Nor can it be justly pretended that by the
principle which attributes to the law of the domicil the power to
fix the civil *status* of persons, any obligation rests on the State to
recognize and uphold within her territory the relation of slave
owner and slave between strangers."

So, here, whereas it would be offensive to the German government,
with which we are at peace, to presume to control or dictate or regu-
late the policies of the German government within the borders of
Germany, we are nevertheless not obligated by the law of comity to
enforce the law of Germany when its enforcement is sought here
contrary to our every sense of justice and liberty and morality.

In announcing this result we are not " looking for trouble."
It is Reichsbahn that is asking us to recognize and apply the German
law. *to an action pending here,* and we answer: " Let us see whether
our public policy enables us to do what you ask."

In so doing we are in no wise seeking to interfere with the internal
affairs of Germany.  We are not at the moment concerned with the
conscience of Germany, but with our own.  We are but applying
our public policy to an action pending here because the policy of
Germany so shockingly conflicts with ours.  It is not a gratuitous
insult to resist an unsavory influence.

Let it be repeated: We do not go out of our path to manifest
disrespect for a foreign government.  We are not sitting in judg-
ment on the acts of the German government; we are dispensing

justice according to our own public policy. Such is the recognized exception to the rule *lex loci contractus*. " When there is confliction between our public policy and comity, our own sense of justice and equity as embodied in our public policy must prevail." (*Vladikavkazsky Case, supra.*)

I hold, therefore, that in this case we are not precluded from exploring the German policy to determine if it does violence to our own public policy.

This exploratory process need not draw us to the soapbox, the lectern or the press. We do not have to go beyond the record — indeed we are not permitted to go beyond the record.

Reichsbahn's answer admits " that in the month of April, 1933, after the coming into power of the present German Government, the plaintiff was seized and incarcerated by the agents of that Government." (¶ 10.) Further, Reichsbahn admits that (¶ 11) " a policy was adopted by the German Government in respect of so-called non-Aryans which required the elimination of certain classes of persons of Jewish or partly Jewish blood from leading commercial, industrial and transportation enterprises, including said defendant, and that the plaintiff became subject to such policy by reason of the fact that he is of Jewish blood and was within said classes of persons when his aforesaid hiring and his employment thereunder were duly terminated pursuant to the laws of Germany."

More, paragraph 12 admits that " the plaintiff became unable to continue his services * * * when he was imprisoned, and thereafter."

Such, asserts Reichsbahn, is the law of Germany. A human being is discharged from his employment because of his religion and jailed. And we are called upon to sanction the act. I say that our public policy does not compel us to give the act reinforcement. To give recognition to such conduct — though it pass for law in Germany — would lacerate our conscience, traduce our Declaration of Independence, rend asunder our Constitutions, Federal and State, antagonize our traditions, mock our history, and outrage our whole philosophy of life.

Not only do we have Reichsbahn's answer, but a part of the record in this case is the " Letter of Resignation of James G. McDonald, High Commissioner for Refugees (Jewish and others) coming from Germany, and addressed to The Secretary General of the League of Nations, with an Annex, containing an analysis of the measures in Germany against ' Non-Aryans,' and of their effects in creating refuges," dated London, December 27, 1933. This is a documented, factual picture of the German scene and is one of the most incredibly shocking and severe indictments of a government in history. The

McDonald report not only boldly etches the plight of the Jews in Germany, but proves by citations that law in Germany for the Jews does not exist. He is not a citizen, he may not vote, he is barred from many businesses and the professions, he has no rights in the courts, he is an " outcast." The McDonald document (p. 21) says:

" The Courts of Germany have not only failed to safeguard the rights of equality and liberty which have become the basis of all civilized legal systems, they have even been transformed into instruments for the extension and application of the racial principle to matters unregulated by formal legislation or unreached by administrative decree.

" This development of their function has been made possible through the avowed abolition by the National Socialist *régime* of the three corner stones of judicial morality; equality of all men before the law; independence of judges; and the doctrine that only those acts are to come under the prohibitions of the law for which the law specifically provides (the maxim, in criminal law, *nullum crimen nulla pœna sine lege*). These fundamental guarantees of civilized justice have been rejected as non-German, ' non-Aryan,' and as Judeo-Roman in origin.

" Therefore, in order to co-ordinate the administration of National Socialist law with the basic philosophy of the *régime*, equality before the law has been replaced by the doctrine of racial inequality; the independence of the judiciary has given way before the *Fährerprinzip* that judges are agents of the Party and that tenure of office is dependent upon their administration of the political and moral standards of the Party, rather than upon the application of abstract justice; and the principle forbidding arbitrary judicial decisions has been abolished in favour of unlimited latitude given the Courts to adjudicate and penalize whether or not a law or a right has been violated."

And (at p. 24): " These new and radical methods of administering justice have, as we shall see, profoundly affected even the minimal rights which have been left to ' non-Aryans ' by the legislation of the Reich. The almost unlimited power given the National Socialist judge; the abolition of judicial safeguards for the accused; the requirement that the judiciary serve the National Socialist viewpoint which regards ' non-Aryans ' as *prima facie* culpable and places their rights upon a plane inferior to those of 'Aryans; ' the replacement of objective legal tests by the subjective will of the judge — all of these principles of the new German judicial administration have not only rendered useless appeals by ' non-Aryans ' to the Courts for the defence of even those few rights still left to them, but have also provided the means of extending the dogma of racial inequality to spheres and cases left untouched by legislation."

Another penetrating searchlight is cast on the status of law in Germany by the absorbing article of Prof. Karl Lowenstein, of Yale, formerly lecturer on constitutional and international law at the University of Munich, and member of the Munich bar, which appeared in the Yale Law Journal for March, 1936, under the title "Law in the Third Reich." Prof. Lowenstein writes (at p. 802): "National Socialism attains its political ends by destruction of the rule of law. * * * Under National Socialism, individual rights become absolute and even obnoxious." And (at p. 811): "Positive law is valid only so far as it corresponds with the political intentions of one man. Stripped of its metaphors, which make little sense to the unbeliever, this assertion is tantamount to a blunt denial of the separation of powers and the rule of law."

We see, therefore, that to say to this plaintiff that this court is powerless to aid him and that he must pursue his remedy in Germany, is to tell him that he has no remedy. I am unwilling to confess that the processes of our judicial system are so sterile.

The invalidity of the second defense is further exposed by the claim that the contract was rendered impossible of performance by virtue of the law of Germany. But Reichsbahn asserts that it *is* Germany; hence the defendant itself created the law which it now invokes as a shield. More, Germany is the law. The defendant, curiously enough, says in effect, "I am unable to perform this contract because I have prohibited myself from performing it."

It is a cardinal rule of law that one may not take advantage of his own wrong. One who occasions a breach cannot benefit thereby. He who makes it impossible to perform a contract will not be heard to plead impossibility of performance. Yet this is precisely what Reichsbahn is essaying.

I do not view comity as a sort of chloroform which drugs our senses during the operation admitted by Reichsbahn and more fully described in the McDonald letter and the article by Prof. Lowenstein. To regard our public policy as so complaisant, so impotent, would be abdicating to futility; it would devitalize law and reduce it to nothing but verbiage. If slavery was anathema in 1852 it is anathema in 1936. The forces of civilization cannot retreat. This holding is not a departure from established doctrine; it creates no new principle. Rather, it is but the application of old law to a new situation. Nor is it intended hereby to fashion a rule to fit all cases. What was expressed by Chief Judge CRANE in the *Dougherty* case (at p. 88) is pertinent: "the language of any opinion must be confined to the facts before the court. No opinion is an authority beyond the point actually decided, and no judge can write freely if every sentence is to be taken as a rule of law, separate from its association."

The second affirmative defense is declared legally insufficient and ordered stricken out.

(3) *Sovereign immunity.*

This defense is the most serious of the three.

" To sue a sovereign State is to insult it in a manner which it may treat with silent contempt. It is not bound to come into our courts and plead its immunity. It is liable to suit only when its consent is duly given." (*Nankivel* v. *Omsk All-Russian Government,* 237 N. Y. 150, 157.)

But is this a suit against the German government or is it against corporations of the German government engaged in the ordinary pursuits of commerce?

In *Bank of the United States* v. *Planters' Bank of Ga.* (9 Wheat. 904, 907, 908) Chief Justice MARSHALL said: " It is we think, a sound principle, that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself and takes the character which belongs to its associates * * * and to the business which is to be transacted. * * * As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation, than are expressly given by the incorporating act." And in *Sloan Shipyards Corp.* v. *U. S. Shipping Board Emergency Fleet Corp.* (258 U. S. 549) Mr. Justice HOLMES, for the court, said (at p. 567): " Supposing the powers of the Fleet Corporation to have been given to a single man we doubt if anyone would contend that the acts of Congress and the delegations of authority from the President left him any less liable than other grantees of the power of eminent domain to be called upon to defend himself in court. An instrumentality of government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts. * * * If what we have said is correct it cannot matter that the agent is a corporation rather than a single man. The meaning of incorporation is that you have a person, and as a person one that presumably is subject to the general rules of law." (Accord: *The Lake Monroe,* 250 U. S. 246; *United States* v. *Strang,* 254 id. 491; *Ingersoll-Rand Co.* v. *United States Shipping Board Emergency Fleet Corp.,* 195 App. Div. 838; *Panama Railroad Co.* v. *Curran,* 256 Fed. 768.) Quite true, these cases concern corporations incorporated in the United States and the participation therein of our own government.

In *Amtorg Trading Corp.* v. *United States* (71 F. [2d] 524, 528) it was held: "The character of the corporation, and its powers and responsibilities, depend upon the place where the charter was granted. *Harley* v. *Charlston Steam-Packet Co.*, 2 Miles (Pa.) 249."

We are dealing here with pleading, not proof. Though the plaintiff maintains that the defendants are corporations and that the suit is not against the German government, the first defense pleads sovereign immunity. The plaintiff cites the record to show that Reichsbahn " Officers are not State Officials " and that " The Officers of the Deutsche Reichsbahn Gesellschaft are not authorities or official officers of the Reich." Whether or not the action is really against the German government will be left to the trial. (*Oliver American Trading Co.* v. *Mexico*, 5 F. [2d] 659.) *Prima facie* the status of these corporate defendants is in doubt.

The trial will disclose the true activities of the defendants and reveal whether they are engaged in " international trade " within the meaning of the treaty granting sovereign immunity. Of course if the suit is actually against the German government, or against a branch of that government, if the German government is the real defendant, the suit must fail. (*DeSimone* v. *Transportes Maritimos Do Estado*, 199 App. Div. 602.)

As addressed to the first separate defense the motion is denied. Summarizing:

The plaintiff's motion to strike out the second and third separate defenses as legally inadequate is granted; it is denied as to the first defense. The defendant may serve an amended answer within thirty days from the service of a copy of the order with notice of entry.