Burke, J. (dissenting).
I concur in Judge Keating’s dissent and agree with his analysis of the Hickenlooper Amendment. However, cognizant of the limited jurisdiction of this court, I do not find it necessary to reach that issue.
It has been long settled by our court (Holzer v. Deutsche Reichsbahn-Gesellschaft, 277 N. Y. 474, cited in Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398, 425) that the applicability of the act of state doctrine in a particular litigation may be a question of fact. It is also well established that an affirmed finding of fact, based upon substantial evidence, will not be reviewed by this court. (See, e.g., the majority and dissenting opinions in Matter of City of New York [Fifth Ave. Coach Lines], 22 N Y 2d 613.) Considering the present appeal in this context, I would affirm the order of the Appellate Division. ■
Before showing that the finding of the Trial Judge, as affirmed by the Appellate Division — that the act of state defense was not established—is nonreviewable, it is first essential that the entire factual background of this case be fully described. Bather than duplicate the majority’s recitation of the “ undisputed facts ” of this case, I begin by supplementing that effort with additional£ £ undisputed facts ’ ’.
Alexander Bitter, at the invitation of Cuba’s Agricultural' Department, purchased a 350-acre farm in Cuba in 1957. In August of that year, he obtained certificates of tax exemption for $345,000 from the Currency Stabilization Fund of the Cuban *69 Government.[1] In January, 1959, Fidel Castro’s revolutionary forces seized control of the Cuban Government. On January 7, 1959, the United States extended recognition to the Castro regime as the “provisional government of the Republic of Cuba.” Such recognition merely noted that Castro had seized control of the country and that he had indicated his intention to comply with the international obligations and agreements of Cuba.[2] In extending recognition in this manner, we in effect insured the revolutionary forces of an ample supply of American dollars as a result of our continued underwriting of the sugar subsidy and through the virtually uninterrupted patronage of American tourists. Shortly thereafter, in either February or March of 1959, Ritter approached Mr. Betancourt, director of the afore-mentioned Currency Stabilization Fund, ■to ascertain whether Banco Nacional was going to fulfill its contractual agreement with him, as embodied in the certificates of August, 1957. In uncontroverted testimony, he related that Mr. Betancourt advised him that Banco Nacional would “ definitely honor the obligation ” IF UPON INVESTIGATION he was found not to be politically implicated (presumably with the overthrown government) and if his business was conducted without graft. In June, 1959, the eight certificates involved in this litigation were given to Ritter by the Currency Stabilization Fund in exchange for his 1957 certificates, purportedly conveying a “guarantee” that Banco Nacional would indeed honor its obligation.
On July 23, 1959, eight days after Decision No. 346 was enacted by the Fund, Ritter presented one of his “ guaranteed certificates” and immediately received payment on it, thus confirming the guarantee given him by Mr. Betancourt. On December 11, he tendered his remaining certificates to Mr. Betancourt. As he recalled the event at trial, ‘ ‘ Mr. Betancourt *70 then said to me that he was sorry * * * he thought he would be able to give us [he and his representative bank] the dollars for the certificates but that he could not.” He further testified that the only reason then offered by Mr. Betancourt for not making the- payment was that “he didn’t have the money.” He also noted that he had waited until December to tender his certificates at the request of the Currency Stabilization Fund. “ In the early Fall of 1959 [after Decision No. 346 was enacted] Mr. Betancourt said to me that the dollar account of the Banco Nacional was low on funds and that he would appreciate it if I would wait until the sugar harvest * * * they would have more funds available later in the year. ’ ’
While Bitter patiently waited for Banco Nacional to acquire these funds, the economic condition of Cuba was continuously deteriorating as Castro repeatedly indicated his willingness to accept Communist assistance with its attached philosophy. Thus, the economic crisis which precipitated Decision No. 346 was brought about by the government itself. This self-imposed financial plight was not lessened by Decision No. 346. Indeed, the Cuban Government effectively seized all property of the United States and its nationals, with the exception of our naval base at Guantanamo Bay, by the end of 1960.[3] It was in accordance with this general policy of confiscation that they first informed Bitter, in a letter dated January 8, 1960, that his certificates were within the ambit of Decision No. 346.
I now turn to the two claims advanced by defendant in this litigation— (1) that it was entitled to sovereign immunity from suit as an agency of the Cuban Government and (2) that Decision No. 346 was an act of the sovereign Government of Cuba, an act of state immune from examination by our court.
As the majority quite properly declares (p. 51), “the entire court is in agreement ” in rejecting the -sovereign immunity claim. I ,am opposed, however, to the majority’s acceptance of the act of state claim as a matter of law in this' litigation. Their conclusion, in effect, contradicts even the position adopted by the defendant at the time of the trial. At that time defendant presented only one witness, a Cuban lawyer, who gave expert testimony concerning both Decision No. 346 and its applicability to Bitter. It would, therefore, appear that *71 even the defendant considered the applicability to be a question of fact. Moreover, while testimony was presented by an expert witness, it cannot be said that this alone proved conclusively that Decision No. 346 applied here as a matter of law. As Judge Bebgan stated so recently in another case ‘' few things are better settled than that the trier of the fact is not bound helplessly by opinion evidence offered by a party having the burden [of proof].” (Matter of City of New York [Fifth Ave. Coach Lines], 22 N Y 2d 613, 629, supra.)
It is plaintiff’s contention that Decision No. 346, an act of the Cuban Government, was not intended to and did not apply to these eight “ guaranteed certificates ”.
While plaintiff’s certificates bear the legend that they were issued “ in accordance with the provisions of Law-Decree No. 548 of November 20, 1952 ” plaintiff has distinguished them from the other certificates in many ways. Thus, Law-Decree No. 548 and Decision No. 346 both specifically limit their applicability to money imported into Cuba for the purpose of investment. Ritter’s certificates were not issued as a direct result of such investment. Bather, they were issued by the Currency Stabilization Fund solely because, upon investigation, Bitter was found free from political implication and because his business was conducted without graft. Plaintiff has shown that nothing was invested at the time these certificates were issued. She intimates that, had this guarantee not been given by the Castro officials of the Currency Stabilization Fund, Bitter would have redeemed his certificates in February or March of 1959—prior to the proclamation of Decision No. 346.
Whether or not these specific eight certificates are within the ambit of Decision No. 346 as stated above is and was treated by all parties at the trial, as a question of fact. Thus, when Supreme Court Justice Mabkewich dismissed the act of state defense for failure of proof, he concluded that the record before him which included expert testimony was inadequate to establish defendant’s claim that Decision No. 346 applied to these eight certificates. The singular issue before this court with respect to the act of state defense is whether there is sufficient evidence in this record to sustain the determination of our lower courts. If there is, then we, an appellate court, possessing very limited jurisdiction, must affirm.
*72 The significance of determining who has the burden of proof in this case is now academic, since proof has been presented. The majority nevertheless takes issue with the lower court’s determination that defendant had the burden of proof by stating that “ It was incumbent on the plaintiff to prove that the Cuban authorities themselves would deem Decision No. 346 invalid and would disregard it. This she was obviously unable to do.” (Emphasis added.) Employing the majority’s criteria, the act of state claim will hinge upon whether plaintiff has shown that the Cuban authorities—in this case, the Currency Stabilization Fund—had treated Decision No. 346 as either invalid or inapplicable to her eight certificates. The record, I submit, establishes that the Cuban authorities did disregard Decision No. 346 when dealing with the plaintiff’s certificates.
On July 23, 1959, eight days after Decision No. 346 was enacted, Bitter received a check for $45,000, as payment for a certificate of that amount. Plaintiff has established that payment. Defendant has not denied that the payment was made, it has not suggested that the payment was made in error. Is this evidence that the Cuban authorities did disregard Decision No. 346 insofar as Bitter was concerned? Could this indicate that his certificates were unaffected by Decision No. 346? Can we then say that the trial court had sufficient evidence before it to consider the application of the act of state doctrine as a question of fact? The answer in each instance must be in the affirmative.
Other acts of the Fund raise doubts regarding the genuineness of the act of state defense, tardily invoked by the defendant.
Five months after his first certificate was honored by the Currency Stabilization Fund, Bitter tendered his remaining certificates to Mr. Betancourt of the Currency Stabilization Fund. According to Bitter’s undisputed testimony, he waited until December to tender his certificates at the request of the Currency Stabilization Fund. This Fund is the official instrumentality of the Cuban Government. This Fund issued the first set of certificates in 1957, and later replaced them with new certificates at Bitter’s insistence. This Fund issued Decision No. 346 temporarily suspending the “ processing of certificates of exemption”. Nevertheless, despite the clear terms of Decision No. 346, this is the Fund that honored one of *73 Ritter’s certificates on July 23, and then, in the fall, expressed an intention to honor his remaining certificates. Thus plaintiff has shown how the Cuban authorities, specifically the Currency Stabilization Fund, at times did disregard Decision No. 346 in dealing with Ritter’s certificates.
The majority has assumed that because the courts in the United States will not inquire into the validity of the acts of a foreign sovereign done within its own territory, then a fortiori, neither can it question whether ,a conceded act of state applies in a particular instance. If this be so, then prior decisions of our courts, cited with approval by the Federal courts, are this day overruled.
A prior decision of this court, cited at the outset of Ibis opinion, Holzer v. Deutsche Reichsbahn-Gesellschaft (277 N. Y. 474, supra) seems directly in point with this present litigation. The plaintiff in that case, a German Jew, was employed by a German corporation which was an instrumentality of the German Government, under a contract of employment which provided that ‘ ‘ in the event the plaintiff should die or become unable, without fault on his part, to serve during the period of the contract the defendants would pay to him or to his heirs the sum of 120,000 marks, in discharge of their obligations, under the hiring aforesaid”. On April 7, 1933, the German Government issued a law, allegedly intended to “ purify” the Civil Service System of that country. In effect, that law required that persons of non-Aryan descent, engaged in any of the leading commercial, industrial or transportation enterprises, be retired immediately. Plaintiff spent his first months of retirement in prison, and was then removed to a concentration camp. Upon his release, he brought an action in this country, against his employer, acquiring jurisdiction by attaching property. Plaintiff’s complaint set forth alternative causes of action. In his first cause of action, he stated that he had fulfilled all the requirements of this contract and that ‘1 defendants discharged [him] * * * upon the sole ground that [he] is a Jew.” He further pleaded that “As a result of such discharge the plaintiff was damaged in the sum of upwards of $50,000, no part of which has been paid although duly demanded.” His second cause of action stated in part that he “ became unable, without any fault on his part, to continue his services from the month of April, 1933, when he was imprisoned *74 * * * The plaintiff accordingly became entitled under his contract to the sum of 120,000 marks, the payment of which was prescribed in the terms of his hiring for that event, no part of which has been paid to him although duly demanded. * * * By reason of the premises the plaintiff was damaged in the sum of about $50,000.”
The responsive pleadings in that case are also significant. The second separate defense, interposed against both causes of action, was as follows: “ The plaintiff was of non-Aryan descent and was within the classes specified and required to be retired by said laws and decrees of said Government, and the plaintiff was duly retired * * * and the plaintiff’s employment thereunder [was] duly and lawfully terminated * * * under and pursuant to said Law * * * and the further performance of the plaintiff’s alleged contract of employment by all parties thereto was thereby prohibited and made unlawful ”. (Emphasis added.) In sum, defendant argues that they were relieved entirely from further performance of the contract by an act of state. The case came before this court solely on the sufficiency of the complaint and the effect of the second defense upon the entire action. It was the unanimous opinion of this court that ‘ ‘ in respect to the first cause of action, we are bound to decide, as a matter of pleading, that the complaint does not state facts sufficient to constitute a cause of action and that the second separate defense of the answer is sufficient in law upon its face. Defendants did not breach their contract with plaintiff. They were forced by operation of law to discharge him.” (277 N. Y., p. 479; emphasis added.) The court then proceeded to sustain the second cause of action, noting the existence “ of questions of fact which must be determined on the trial.” (277 N. Y., p. 480; emphasis added.) Thus, the mere allegation that the act of state defense applied to all the clauses of the German contract did not preclude this court from requiring proof that the act of state did in fact apply in a particular situation. Hence, the reference in Holzer to “ questions of fact which must be determined ”. To require a determination of whether the act of state defense applied to the severance provision of this German contract seems identical to the burden imposed on the respondent in this case; specifically to show by credible evidence that the act of state defense applied to Bitter’s eight certificates. As the Supreme Court clearly stated in *75 Ricaud v. American Metal Co. (246 U. S. 304, 309): “ When it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the paerit of the result cannot be questioned but must be accepted by our courts as a rule for their decision. ’ ’ By concluding that Ritter cannot recover on his certificates because there was no provision for payment of any sum in the event of dishonor, Justice Hopkins has misapplied the test. The sole factual question here to be determined is whether the act of state applied to the subject matter of the litigation— Ritter’s eight certificates. The interpretation of Eolzer, proposed in the concurring opinion, that it “ might be found as a fact * * * that the contract contemplated payment of the agreed sum upon the occurrence of the very act of state which prevented plaintiff’s performance ” seems illogical as the act of the German Government prohibited and made unlawful any further performance of the contract BY EITHER PARTY and directed that its provisions be enforced ‘ ‘ without recourse to courts and other legal remedies ”. Moreover, it appears to conflict with the act of state doctrine, as expressed in the majority opinion.
Here we do not have mere pleadings, as in Eolzer. The ease is before us after a trial where plaintiff proved part performance of the guarantee given Ritter when his replacement certificates were issued in 1959. Thus, it was shown that after Decision No. 346 was enacted, payment was made on one certificate by defendant and that Ritter was thereafter requested twice to refrain from presenting his remaining certificates for payment for reasons altogether unrelated to, and inconsistent with, Decision No. 346. This evidence presented a triable issue of fact, i.e., whether Decision No. 346 was at all relevant to these specific certificates. To establish its relevancy, the defendant relied on the testimony of an expert witness. The Trial Judge, who passes on both the credibility of a witness and the weight of the evidence in general, found this testimony insufficient. In so doing, he acted within the bounds of his authority. While the concurring opinion acknowledges the present vitality of both Eolzer and Ricard, it has failed to apply the principle of those cases in this instance.
In summary, I am of the opinion that a question of fact was presented as to the applicability of the act of state defense to *76 the subject matter of this litigation; that there is evidence to support the finding of the trial court, and that, in reviewing the record, this court may not review this affirmed finding of fact. The words of Chief Judge Crane in Dougherty v. Equitable Life Assur. Soc. (266 N. Y. 71, 88), another decision by this court involving the act of state defense, seem particularly pertinent: “ The language of any opinion must be confined to the facts before the court.”

. Law Decree 548, authorizing the issuance of these tax exemption certificates, specifically limits the circumstances under which they may be obtained.
“ Artigue 1. A total exemption * * * is hereby granted for all exportations of money imported into Cuba from foreign countries in order to invest it in industrial, agricultural or other production enterprises ”. (Emphasis added.)

. Edward D. Re, The Foreign Claims Settlement Commission and the Cuban Claims Program, 1 International Lawyer 81 (Oct., 1966). In 1959, the United States “made known its willingness to discuss the economic needs of Cuba.” (Edward D. Re, op. cit., p. 81.)

. Edward D. Re, op. cit., n. 2.