ESTHER G. M. PEREZ, as Administratrix of the Estate of ROSA M. MANAS Y PINEIRO, Deceased, Appellant, v CHASE MANHATTAN BANK, N. A., Respondent.

First Department, May 5, 1983

#### APPEARANCES OF COUNSEL

*Gerald D. Roth* of counsel (*Irving Margolies* and *Peter P. Kenny* with him on the brief; *Lipkowitz & Plaut,* attorneys), for appellant.

*Andrew J. Connick* of counsel (*Richard P. Swanson* with him on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for respondent.

#### OPINION OF THE COURT

MILONAS, J.

In 1958 during the final months of the Batista regime, plaintiff-appellant, a Cuban citizen, at various times obtained five certificates of deposit, totaling $227,336.47, from defendant-respondent Chase Manhattan Bank's Mar-

ianao branch in Havana.* The forces of Fidel Castro assumed control of the Cuban government on January 1, 1959, and plaintiff's husband, who had been Batista's Minister of Communications, fled to Colombia in March of 1959. Plaintiff later joined her husband in Colombia, but she then returned to Cuba, where she remained for a number of months. She was reunited with her husband in Mexico, and in 1961, the couple moved to the United States. In September of 1959, the new Cuban government instructed Chase to close a number of frozen accounts, among them plaintiff's, and remit the proceeds to the Ministry for the recovery of Misappropriated Funds. Shortly thereafter, all of Chase's branches were national-

---

* The certificates of deposit are identical in form and differ only in the amounts and issue dates involved. The following represents one of those certificates in both its original Spanish and English translation:

"No. FD 1877   Marianao La Habana, Cuba, Noviembre 7 de 1958
$66,440.16
"THE CHASE MANHATTAN BANK
"Marianao, Habana, Cuba
"HACE CONSTAR QUE la Sra. Rosa Maria Mañas y Piñeiro
"EN ESTA FECHA HA CONSTITUIDO EN ESTE BANCO EN CALIDAD DE DEPOSITO A PLAZO FIJO LA CANTIDAD DE: SESENTA Y SEIS MIL CUATROCIENTOS CUARENTA Y 16/100 MONEDA NACIONAL LA QUE LE SERA DEVUELTA PREVIA PRESENTACION DE ESTE DOCUMENTO EN ABRIL 7 DE 1959, MAS INTERESES AL TRES POR CIENTO ANUAL (-3%), QUEDANDO ENTENDIDO QUE EL REFERIDO DEPOSITO NO ES TRANSFERIBLE NI NEGOCIABLE EN FORMA ALGUNA Y UNICAMENTE PODRA SER DEVUELTA AL DEPOSITANTE.

"The Chase Manhattan Bank
"Signature Illegible                    "Signature Illegible
"FIRMA AUTHORIZADA                       "FIRMA AUTHORIZADA
"cgz

"CERTIFICADO DE DEPOSITO A PLAZO FIJO "NO TRANSFERIBLE NI NEGOCIABLE

TRANSLATION

from: Spanish WB:rf
"No. FD 1877 Marianao, Havana, Cuba, November 7, 1958
"Pesos 66,440.16
"THE CHASE MANHATTAN BANK
"New York
"Marianao Branch
"Herewith certifies that Rosa Mañas y Piñeiro
"Has today established at this Bank as fixed-term deposit the amount of: SIXTY-SIX THOUSAND FOUR HUNDRED FORTY AND 16/100—national currency, which will be returned upon submission of this document on April 7, 1959, plus interest at THREE PER CENT PER ANNUM (-3%), it being understood that said deposit is not transferable or negotiable in any form and can only be returned to the depositor.

"The Chase Manhattan Bank
"S/Signature Illegible                   "S/Signature Illegible
"Authorized Signature                    "Assistant Manager
"cgz

"Certificate of Deposit for Fixed Term Not Transferable or Negotiable

ized. Its assets were confiscated, and the liabilities were assumed by the government. Chase's former branches were henceforth operated by the Banco Nacional de Cuba.

In January of 1974, plaintiff demanded in New York that Chase make payment under the certificates of deposit. The next month, Chase notified plaintiff that it would not honor her request for payment, stating that the certificates were obligations incurred solely by Chase's Marianao branch, and since the Cuban government had seized that bank's assets and acquired its liabilities, Chase in New York had no responsibility in the matter. Plaintiff then commenced the instant action by motion for summary judgment in lieu of complaint, and Chase cross-moved for summary judgment. The Supreme Court, New York County, denied both motions, and this court affirmed, asserting that there were sufficient factual issues involved to preclude summary judgment (*Manas y Pineiro v Chase Manhattan Bank*, 52 AD2d 794). Although Chase subsequently removed the case to the United States District Court for the Southern District of New York, the court remanded back to the State court (443 F Supp 418).

The parties finally proceeded to trial in June of 1980. The following three questions were submitted to the jury:

"1. What was the intention of the plaintiff and the defendant with regard to the currency with which the certificates of deposit were to be repaid? 1. U.S. dollars; 2. Cuban pesos.

"2. What was the intention of the plaintiff and the defendant with regard to the place of presentment of the certificates of deposit? 1. New York only; 2. Marianao, Cuba only; 3. any branch of the defendant Chase anywhere in the world, including New York and Marianao, Cuba; 4. any branch of defendant Chase anywhere in the world, excluding Marianao, Cuba.

"3. Were the plaintiff's funds on deposit in defendant Chase in Marianao confiscated by the Cuban government's Ministry of Misappropriated Funds?"

The jury returned a verdict on the first two questions that the certificates of deposit were repayable in United States dollars and that the certificates could be presented

to any Chase branch in the world, including New York and Cuba. After asking for clarification as to the third question, and then indicating some uncertainty with the court's explanation, the jury ultimately answered "Yes" to whether the plaintiff's funds on deposit in Chase's Marianao branch were confiscated by the Ministry of Misappropriated Funds. Based upon these findings and, as a matter of law, the trial court granted judgment to the defendant (*sub nom. Manas y Pineiro v Chase Manhattan Bank,* 106 Misc 2d 660).

In *Underhill v Hernandez* (168 US 250, 252) the United States Supreme Court defined the Act of State doctrine as providing that: "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." This principle was reaffirmed in *Banco Nacional de Cuba v Sabbatino* (376 US 398, 428) wherein the Supreme Court declared that "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." Thus, according to the Supreme Court, United States courts should not ordinarily engage themselves to resolve disputes arising out of the nationalization by other Nations of property owned by aliens.

Apparently dissatisfied with the decision in *Sabbatino* (*supra*), as well as with the failure of the executive branch adequately to protect American property abroad from expropriation, Congress adopted the so-called "Hickenlooper Amendment". The first version became part of the Foreign Assistance Act of 1964 and provided that: "Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right is asserted by any party including a foreign state (or a party claiming through such

state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and other standards set out in this subsection". (78 US Stat 1013, US Code, tit 22, § 2370, subd [e], par [2].)

Nonetheless, the practical impact of the "Hickenlooper amendment" (both the first and subsequent variations thereof) is uncertain. For instance, in *French v Banco Nacional de Cuba* (23 NY2d 46) the New York Court of Appeals considered the effect of the amendment on the action before it. There, plaintiff's assignor, Alexander Ritter, an American citizen who resided in Cuba at the time of the events in question, put about $350,000 into a Cuban farm. This was in 1957, when the Cuban government permitted foreign investors to convert the proceeds from their enterprises into American dollars or other currency, and exempted such proceeds from Cuba's tax on the exportation of money. For this purpose, the Currency Stabilization Fund of the Cuban government would issue "certificates of tax exemption". In June of 1959, six months after Castro came to power, Ritter acquired eight such certificates, aggregating $150,000. On July 15, 1959, the Currency Stabilization Fund suspended the processing of tax exemption certificates and declined to redeem Ritter's certificates in American dollars when he tendered them in December of 1959. Thereafter, plaintiff instituted suit against the defendant bank. The Court of Appeals ruled, however, that the action was barred under the Act of State doctrine, since the alleged breach of contract resulted from an act of State. In the view of the court, the refusal of the Cuban government to exchange certificates (pesos) for dollars was not the sort of taking envisioned by the "Hickenlooper Amendment", but rather involved a currency control regulation not subject to challenge in our courts.

The United States Supreme Court also had occasion to consider the scope of the Act of State doctrine following the passage of the amendment. In two separate cases, a divided court seemed to retreat from the broad position which it had taken in *Banco Nacional de Cuba v Sabbatino* (*supra*). (*First Nat. City Bank v Banco Nacional de Cuba,* 406 US

759; *Dunhill of London v Cuba,* 425 US 682.) In *First Nat. City Bank v Banco Nacional de Cuba* (*supra*) the court was confronted with the question of whether First National City Bank could retain the balance of proceeds derived from the sale of collateral securing a loan to a predecessor of Banco Nacional, after deducting the loan balance due, as a setoff against bank property which had been appropriated by Cuba. After hearing the case on the merits, the Supreme Court, by a 5 to 4 vote, reversed a Second Circuit decision that the court was precluded by the Act of State doctrine from reviewing the validity of the Cuban seizure, and remanded for consideration under principles of customary international law. Three Justices concluded that since the executive branch, which is charged with the primary responsibility for the conduct of foreign affairs, had represented that reliance upon the Act of State doctrine would not advance the interests of American foreign policy (Bernstein letter), the judiciary should examine the legal issues raised by the acts of a foreign sovereign within its own territory. Of the two concurring Justices, one went so far as to challenge the court's prior holding in *Sabbatino.* The four dissenters expressed the opinion that the Act of State doctrine, as enunciated in *Sabbatino,* required that First National City Bank's counterclaims against Banco Nacional be dismissed on the ground that "the validity of a foreign act of state in certain circumstances is a 'political question' not cognizable in our courts" (at pp 787-788). However, except for a reference in one of the dissent's footnotes to the "Hickenlooper Amendment" (at p 780, n 5, stating that "I agree with my colleagues in leaving * * * undisturbed" the Second Circuit's determination that the "Hickenlooper Amendment" was inapplicable), there is no discussion at all of that amendment.

*Dunhill of London v Cuba* (*supra*) concerned the nationalization by the Cuban government of the business and assets of five leading manufacturers of cigars, whose plants were located in Cuba and whose products were shipped to importers in the United States. Upon the take-over by the Cuban government, the owners were immediately ousted and persons called "interventors" were designated as its agents to manage the businesses. Both the former owners

and the interventors asserted their right to sums due from importers for shipments made after the Cuban seizure. In addition, as of the date of the confiscation, the importers also owed various amounts for preintervention shipments, which they later paid to the interventors. The former owners also laid claim to these accounts. The District Court, in reliance upon the Act of State doctrine, ruled that the interventors could collect the amount due for cigars shipped after the nationalization but that the owners were entitled to the preintervention accounts receivable. In addition, the interventors were obligated to repay the importers for the sums mistakenly paid them, and the importers could set off their postintervention payments due to the interventors against the amounts owed to the owners for preintervention shipments. The Second Circuit, however, held that the Cuban government's appropriation of the owners' accounts receivable, having their situs in the United States, was unauthorized, but that the interventors' refusal to reimburse the importers for the amount paid by mistake for preintervention shipments was an act of State. The court did allow the importers' counterclaims for reimbursement, but only up to the limit of the interventors' claims for postintervention shipments. Further, the "Hickenlooper Amendment" was deemed no bar to invoking the Act of State doctrine.

The Supreme Court, once again by a 5 to 4 vote, reversed, finding that the refusal of the interventors to return the sums paid to them in error did not constitute an act of State. Of the majority, four Justices stated that reversal was warranted because "the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." (*Dunhill of London v Cuba, supra,* at p 695.) Quoting from *Ohio v Helvering* (292 US 360, 369) and *New York v United States* (326 US 572, at p 579), these Justices stated that (p 696): " 'When a state enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto,* and takes on the character of a trader.' It is thus a familiar concept that 'there is a constitutional line between the State as government and the State as trader' ". Although the dis-

senting opinion concluded that an act of State was involved here, it did not exclude the possibility of a "commercial act" exception to the Act of State doctrine. It merely noted that "ultimately there is no need to consider whether, and under what circumstances, an exception for commercial acts might be appropriate. It will suffice to say that no such exception is appropriate in this case" (at p 724).

Regardless of whether or not the Supreme Court ultimately establishes a "commercial act" exception to the Act of State doctrine, it is clear that while the principle of Act of State has been applied by courts with regard to the taking by a foreign sovereign of tangible property within its own territory, the viability of the doctrine as to intangible property in the nature of debts and claims is not settled. It does appear, however, that where the obligation is found to be situated *exclusively* within the foreign State, then the Act of State doctrine will be applied. In *Dougherty v Equitable Life Assur. Soc. of U.S.* (266 NY 71) the Court of Appeals denied recovery under insurance contracts which were entered into prior to the Russian Revolution between the defendant, a New York corporation, and subjects of the Imperial Russian government. The policies contained express provisions that all disputes thereunder would be settled according to Russian laws and in Russian courts and that the right to do business in Russia might at any time be canceled by the government. After the revolution, the Soviet authorities promulgated decrees giving the government an exclusive monopoly over the insurance business and requiring that all private companies, including that of the defendant, be completely liquidated. All life insurance policies were canceled, and defendant's assets in Russia were seized. The court held that under the contracts at issue, the defendant was not liable until Russian law determined that there was an obligation and, since the United States had recognized the Soviet Republic, its decrees constituted the valid law of Russia.

Certainly, the Act of State doctrine should not be, and apparently never has been, applied to relieve an American bank of obligations owed by its branches to depositors. For one thing, obligations undertaken by a corporation at a branch are generally obligations of the corporation as a

whole. (See *United States v First Nat. City Bank,* 321 F2d 14.) For another, the bank is not considered to be merely a bailee for the depositor, nor are any of its assets particularly set aside for the depositor's use. (*Sokoloff v National City Bank of N. Y.,* 239 NY 158.) In *Sokoloff,* the plaintiff, a Russian subject, paid a sum of money to the defendant bank which was to be transferred to his account at the bank's Petrograd branch. This was done, and the plaintiff from time to time drew upon the funds in his account, but subsequent checks were presented and dishonored. The defendant alleged that there was a revolution in Russia in November of 1917, which resulted in the formation of the Russian Socialist Federated Soviet Republic and that, in the same month, the new government decreed the nationalization of all private joint stock banks organized under the laws of Russia or operating therein. Also pursuant to that decree, all assets and liabilities of the liquidated banks were taken over by the State Bank of the Soviet government, and, therefore, the defendant contended, the government assumed the liability, if any, owing to the plaintiff, thus divesting the defendant of any responsibility. In rejecting the bank's argument, the court stated (p 167) that: "The defendant's liability was unaffected by the attempt to terminate its existence and the seizure of its assets. A government of Russia *could* not terminate its existence either by dissolution or by merger, for it was a corporation formed under our laws, and its corporate life continued until the law of its creation declared that it should end. What a Russian government could do was to deprive it of the privilege of doing business upon Russian soil. But the ending of its Russian business was not the ending of its duty to make restitution for benefits received without requital."

According to the Court of Appeals, the "*res* belonging to the plaintiff was not a physical object committed to the defendant's keeping, but an intangible right, a chose in action, the right to receive rubles in the future under an executory contract. This contract the defendant has not performed, yet it refuses to return the dollars that were paid to it by the plaintiff upon its promise of performance" (p 166).

In a case bearing some similarity to the instant one, the Second Circuit considered the liability of defendant Chase Manhattan Bank to plaintiffs, Vietnamese corporations which had maintained piastre demand deposit accounts at Chase's Saigon branch and a Vietnamese citizen who had purchased a six-month certificate of deposit from that same branch. (*Vishipco Line v Chase Manhattan Bank, N. A.,* 660 F2d 854, cert den __ US __, 103 S Ct 313.) Plaintiffs claimed that Chase breached its deposit contracts with them when it closed its Saigon branch in April of 1975 to escape from the Communist insurgents and then refused to make payment in New York of the amounts owed. Chase interposed a series of affirmative defenses, including the assertion that the confiscation of Chase's former branch in South Vietnam by the dominant authorities relieved Chase of any liability to plaintiffs and that Chase could not be held liable since the piastre accounts for which plaintiffs sought recovery were payable only in piastre at its Saigon branch. In reversing a District Court determination that the Vietnamese government was the successor in interest to the plaintiff corporations and that the real defendant was not Chase in New York but Chase's former branch in Saigon, the Second Circuit concluded that the "impossibility of performance in Vietnam did not relieve Chase of its obligation to perform elsewhere. By operating in Saigon through a branch rather than through a separate corporate entity, Chase accepted the risk that it would be liable elsewhere for obligations incurred by its branch" (p 863). The court also noted (p 864) that: "A bank which accepts deposits at a foreign branch becomes a debtor, not a bailee, with respect to its depositors. In the event that unsettled local conditions require it to cease operations, it should inform its depositors of the date when its branch will close and give them the opportunity to withdraw their deposits or, if conditions prevent such steps, enable them to obtain payment at an alternative location * * * In the rare event that such measures are either impossible or only partially successful, fairness dictates that the parent bank be liable for those deposits which it was unable to return abroad."

Moreover, the court in *Vishipco (supra)* rejected Chase's attempt to rely on the provision of section 138 of the New

York Banking Law, which, under certain circumstances, limits the liability of banks having foreign branches for contracts to be performed at those branches, declaring that section 138 applies only to New York State banks and not those, such as Chase, which are national in scope. However, even assuming section 138 could be interpreted to cover situations involving national banks, the statute in no way relieves a bank from liability for deposits payable at both the branch and home office.

In the matter at issue here, the jury found that the certificates of deposit could be presented to any Chase branch in the world, including its New York office. As Patrick Heininger has written in his detailed article, Liability of U. S. Banks for Deposits Placed in Their Foreign Branches (11 Law and Policy in International Business 903-1034): "The fact that a Cuban decree provided that the Banco Nacional assumes a liability of Chase's Cuban branch would not, and could not in these circumstances, affect a liability the bank had undertaken in respect to its New York office. Even if the Cuban decree purported to affect such liability, the New York courts would neither be obligated to, nor should they, give it effect. An act of state that permits a particular result, but does not require it, need not be given effect" (p 994).

Mr. Heininger also points out that it is easy enough for a government to order the seizure of a branch's assets, but quite another for it to actually gain control over those assets. (id., pp 999-1000). Funds entrusted to banks by depositors do not ordinarily rest undisturbed in the branch's vaults. The money is loaned out and otherwise invested, so that the expropriation will generally be quite ineffective as to investments and loans made outside the branch Nation. In addition, deposits collected in the confiscating country may be sent back to the home office for use there. Assets derived from this source also will not be lost as a consequence of the nationalization. Therefore, to uphold the trial court's decision in the present case could actually have the effect of providing a windfall for Chase and other banks in its position. Although these banks would, in the event of nationalization, no longer bear any liability in connection with obligations incurred at its

foreign branches, they would, in all probability, be divested of only a portion of the assets obtained from depositors in the host Nation. The fact that Chase may have chosen to comply with Cuba's direction to remit the proceeds of plaintiff's account to the Ministry for the Recovery of Misappropriated Funds does not relieve the bank of its obligation to plaintiff. Plaintiff cannot be bound by Chase's voluntary action in making payment to Cuba, since a government which has adopted a law seizing a bank's assets would have no means of enforcing its edict beyond its own borders. (*Republic of Iraq v First Nat. City Bank,* 353 F2d 47, cert den 382 US 1027.) In that regard, the Court of Appeals, in a recent discussion of the Act of State doctrine (*Weston Banking Corp. v Turkiye Garanti Bankasi,* 57 NY2d 315, 323-324), has stated that: "We have, however, refused to apply the doctrine when the debt sought to be enforced was not located within the State whose acts are said to be dispositive. (*Zeevi & Sons v Grindlays Bank* [*Uganda*], 37 NY2d 220, 228, cert den 423 US 866.) 'The doctrine is not applicable here', we held, 'since a debt is not "located" within a foreign State unless that State has the power to enforce or collect it.'"

The jury herein found that Chase was obliged to redeem the certificate of deposit, defined as a written acknowledgment by a bank of the receipt of money with an engagement to repay it (9 NY Jur 2d, Banks, § 267), for dollars upon presentment at "any branch of defendant Chase anywhere in the world, including New York and Marianao, Cuba." In view of the existing case-law authority, and considering the realities of commercial business practices, Chase's effort to escape its clear obligation to plaintiff cannot be sanctioned by this court. The Act of State doctrine is simply not applicable to the situation with which this court is confronted.

Accordingly, judgment of the Supreme Court, New York County (L. COHEN, J.), entered on December 29, 1980, which awarded judgment to defendant Chase Manhattan Bank, should be reversed on the law, with costs, and judgment directed in favor of plaintiff. Settle order.

SANDLER, J. P., CARRO, FEIN and KASSAL, JJ., concur.

Judgment, Supreme Court, New York County, entered on December 29, 1980, unanimously reversed, on the law, and judgment directed in favor of plaintiff. Appellant shall recover of respondent $75 costs and disbursements of this appeal.